**EXHIBIT "A"**

# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA

**136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303**

## SUMMONS

Keystone Solutions, LLC

) **Case**
) **No.:**    2022CV369921
)
)
**Plaintiff,**
)
)
**vs.**
)
FISERV SOLUTIONS, LLC as converted from
)
)
FISERV SOLUTIONS, INC.
)
)
**Defendant**
)
)
)
)

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at
https://efilega.tylerhost.net/ofsweb (unless you are exempt from filing electronically) and serve upon
plaintiff's attorney, whose name and address is:

Jack C. Lundstedt Jr.
655 Buttercup Trce
Alpharetta, GA 30022

An answer to the complaint which is herewith served upon you, within 30 days after service of this
summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed
within five (5) business days of such service. Then time to answer shall not commence until such proof of
service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This  7th   8th             day of September , 20 22

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court
By
Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you             , 20

Deputy Sherriff

**Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used**

Fulton County Superior Court
***EFILED***TV
Date: 9/8/2022 1:22 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **KEYSTONE SOLUTIONS, LLC** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **FISERV SOLUTIONS, LLC as converted from** | ) |
| **FISERV SOLUTIONS, INC.** | ) |
| | ) |
| **Defendant.** | ) |

**CIVIL ACTION NO.** 2022CV369921

## **VERIFIED COMPLAINT**

Plaintiff Keystone Solutions, LLC ("Keystone" or "Plaintiff") hereby files this Verified Complaint (the "Complaint") for damages against Defendant Fiserv Solutions, LLC as converted from Fiserv Solutions, Inc. ("FISERV" or "Defendant"), showing the Court as follows:

### **Jurisdictional Allegations**

1.

Plaintiff Keystone is a Nevada limited liability company formed under the laws of the state of Nevada and domesticated in Georgia with its principal place of business at 12460 Crabapple Rd, Ste 202, #114, Alpharetta, Georgia, 30004.

2.

Defendant FISERVE is a Wisconsin limited liability company formed under the laws of the State of Wisconsin and domesticated in Georgia with its principal place of business located at 255 Fiserv Drive, Brookfield, Wisconsin 53045.

3.

FISERV can be served through its registered agent, Prentice Hall Corporation, at 2 Sun Court, Suite 400, Peachtree Corners, Georgia, 30092.

4.

This Court has jurisdiction over this matter and venue is proper in this Court.

**<u>Facts</u>**

5.

On or about January 13, 2015, Plaintiff, through its Chief Executive Officer Matthew Gellis ("Gellis"), and Defendant through its authorized signatory Tom Roberts, executed that certain Consulting Services Agreement (the "<u>Services Agreement</u>").

6.

A true and correct copy of the Services Agreement is attached hereto as Exhibit "A" and incorporated herein by this reference.

7.

Pursuant to Section 2.1 of the Services Agreement, all "Services" and "Deliverables" (as defined therein) were to be set forth in a Statement of Work or "SOW" and each SOW was to be "governed in all respects by the terms and conditions of [the Services] Agreement."

8.

On or about December 15, 2016, Plaintiff and Defendant "subject to the [Services Agreement"], duly executed and enter into Statement of Work #06 ("SOW #6").

9.

Pursuant to SOW #6, Plaintiff offered a discounted rate of service from $190/hr to $140/hr (the "Discounted Rate") which was expressly stated in Section 6(f) as being:

*"contingent upon the following participation of Company with Keystone, subject to Section 6.1 of the Agreement:*

*a) Ability to use Fiserv logo, in accordance with Fiserv branding guidelines, in standard Keystone collateral which may include sales presentations, internal meetings, external website, and other marketing material. General logo use is limited to indication of Fiserv as a client of Keystone for the purposes of digital measurement strategy and execution. For all other presentations, education, or collateral the use of Fiserv logo will be as agreed in writing by Fiserv, and in accordance with Fiserv branding guidelines.*

*b) Testimonial from Sr. Leadership at project kickoff and end of engagement and key milestones as mutually agreed on through the term of the SOW and with prior approval and consent from Fiserv.*

*c) Reference calls with Keystone prospects with prior notice and scheduling availability, as mutually agreed on in advance.*

10.

*d) Four (4) joint case studies/white papers on key value propositions for both Keystone and Fiserv over the term of engagement."*

11.

A true and correct copy of SOW #6 is attached hereto as Exhibit "B" and incorporated herein by this reference.

On or about January 11, 2018, Plaintiff and Defendant "subject to the [Services Agreement"], duly executed and enter into Statement of Work #07 ("SOW #7").

12.

Pursuant to SOW #7, Plaintiff offered a discounted rate of service at the Discounted Rate, contingent upon the obligations expressly reincorporated and reestablished in Section 6(f).

- 3 -

13.

A true and correct copy of SOW #7 is attached hereto as Exhibit "C" and incorporated herein by this reference.

14.

Pursuant to SOW #6 and SOW #7, Keystone performed approximately 8,214 hours of work at the Discounted Rate.

15.

As of the date of the filing of this Complaint, FISERV failed to meet any of its obligations under section 6(f) of SOW #6 and SOW #7.

16.

FISERV is in breach of the Services Agreement pursuant to its failure to meet its obligations under SOW #6 and SOW #7.

17.

On or about October 9, 2018, Plaintiff and Defendant "subject to the [Services Agreement"], duly executed and entered into Statement of Work #08 ("SOW #8").

18.

Pursuant to SOW #8, Plaintiff offered a discounted rate of service at the Discounted Rate, contingent upon the obligations expressly reincorporated and reestablished in Section 6(f).

19.

A true and correct copy of SOW #8 is attached hereto as Exhibit "D" and incorporated herein by this reference.

20.

Pursuant to SOW #8, Keystone performed approximately 2,857 hours of work at the Discounted Rate.

21.

As of the date of the filing of this Complaint, FISERV failed to meet any of its obligations under section 6(f) of SOW #8.

22.

FISERV is in breach of the Services Agreement pursuant to its failure to meet its obligations under SOW #8.

23.

On or about October 9, 2018, Plaintiff and Defendant "subject to the [Services Agreement"], duly executed and entered into Statement of Work #09 ("SOW #9").

24.

Pursuant to SOW #9, Plaintiff offered a discounted rate of service at the Discounted Rate, contingent upon the obligations expressly reincorporated and reestablished in Section 6(f).

25.

A true and correct copy of SOW #9 is attached hereto as Exhibit "E" and incorporated herein by this reference.

26.

Pursuant to SOW #9, Keystone performed approximately 892 hours of work at the Discounted Rate.

27.

As of the date of the filing of this Complaint, FISERV failed to meet any of its obligations under section 6(f) of SOW #9.

28.

FISERV is in breach of the Services Agreement pursuant to its failure to meet its obligations under SOW #9.

29.

On or about September 16, 2019, Plaintiff and Defendant "subject to the [Services Agreement"], duly executed and enter into Statement of Work #10 ("SOW #10").

30.

Pursuant to SOW #10, Plaintiff offered a discounted rate of service at the Discounted Rate, contingent upon the obligations expressly reincorporated and reestablished in Section 6(f).

31.

A true and correct copy of SOW #10 is attached hereto as Exhibit "F" and incorporated herein by this reference.

32.

Pursuant to SOW #10, Keystone performed approximately 892 hours of work at the Discounted Rate.

33.

As of the date of the filing of this Complaint, FISERV failed to meet any of its obligations under section 6(f) of SOW #10.

34.

FISERV is in breach of the Services Agreement pursuant to its failure to meet its obligations under SOW #10.

35.

On or about March 26, 2020, Plaintiff and Defendant "subject to the [Services Agreement"], duly executed and enter into Statement of Work #11 ("SOW #11").

36.

Pursuant to SOW #11, Plaintiff offered a discounted rate of service at the Discounted Rate, contingent upon the obligations expressly reincorporated and reestablished in Section 6(f).

37.

A true and correct copy of SOW #11 is attached hereto as Exhibit "G" and incorporated herein by this reference.

38.

Pursuant to SOW #11, Keystone performed approximately 1,217 hours of work at the Discounted Rate.

39.

As of the date of the filing of this Complaint, FISERV failed to meet any of its obligations under section 6(f) of SOW #11.

40.

FISERV is in breach of the Services Agreement pursuant to its failure to meet its obligations under SOW #11.

41.

On or about March 26, 2020, Plaintiff and Defendant "subject to the [Services Agreement"], duly executed and enter into Statement of Work #12 ("SOW #12").

42.

Pursuant to SOW #12, Plaintiff offered a discounted rate of service at the Discounted Rate, contingent upon the obligations expressly reincorporated and reestablished in Section 6(f).

43.

A true and correct copy of SOW #12 is attached hereto as Exhibit "H" and incorporated herein by this reference.

44.

Pursuant to SOW #12, Keystone performed approximately 509 hours of work at the Discounted Rate.

45.

As of the date of the filing of this Complaint, FISERV failed to meet any of its obligations under section 6(f) of SOW #12.

46.

FISERV is in breach of the Services Agreement pursuant to its failure to meet its obligations under SOW #12.

47.

On or about February 9, 2021, Plaintiff and Defendant "subject to the [Services Agreement"], duly executed and enter into Statement of Work #13 ("SOW #13").

48.

On March 3, 2021, pursuant to that certain letter attached hereto as Exhibit "I" and incorporated herein by reference, FISERV unilaterally terminated SOW #13 and ceased its relationship with Keystone (the "Termination Letter").

49.

Notwithstanding the Termination Letter, as of the date of the filing of this Complaint, neither FISERV nor Keystone has terminated the Services Agreement.

50.

On September 24, 2001, Keystone notified counsel for FISERV in writing that FISERV was in breach of the Services Agreement. On October, 15, 2021, FISERV responded to Keystones allegations and the parties set forth the representatives to begin an informal workout.

51.

A true and correct copy of the October 15, 2021 FISERV letter is attached hereto as Exhibit "J" and incorporated herein by reference.

52.

As of the filing of this Complaint, the principal amount due Keystone by FISERV for breach of contract is $729,050.00 (14,581 hours x $50/hr).

53.

The aforementioned outstanding amount does not include any unpaid interest or late charges and is exclusive of costs of collection and attorneys' fees available under Services Agreement.

## Count I

### BREACH OF SERVICES AGREEMENT AGAINST FISERV

54.

The foregoing paragraphs of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

55.

FISERV breached its obligations under the Services Agreement by failing to fulfill any of its contractual obligations under Section 6(f) of SOW#6, SOW#7, SOW#8, SOW#9, SOW#10, SOW#11, and SOW #12.

56.

As a result of the breach of contract described above, FISERV is liable to Keystone for difference in the Discounted Rate, which remains unpaid.

57.

Keystone was damaged as a result of the breach of contract described above.

58.

Keystone is entitled to recover from FISERV all amounts due, owing, and accruing under the Services Agreement and applicable law, including but not limited to, the amount currently due and payable under Services Agreement in the amount of $729,050.00, plus such further interest, expenses, costs, and attorney's fees as the same have accrued and continue to accrue.

## **Count II**

### **UNJUST ENRICHMENT AGAINST FISERV**

59.

The foregoing paragraphs of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

60.

Keystone provided FISERV a valuable service at the Discounted rate contingent upon FISERV's fulfillment of its obligations under Section 6(f) of SOW#6, SOW#7, SOW#8, SOW#9, SOW#10, SOW#11, and SOW #12.

61.

Keystone knowingly accepted the benefits accruing under the Services Agreement and failed to perform its obligations under Section 6(f) of SOW#6, SOW#7, SOW#8, SOW#9, SOW#10, SOW#11, and SOW #12.

62.

FISERV's receipt of the aforementioned benefits without compensating Keystone would be unjust.

63.

FISERV has been unjustly enriched in the amount of $729,050.00, plus expenses, costs, and attorneys' fees.

64.

FISERV, in fairness and good conscience, should reimburse Keystone to the extent of the value conferred, which includes all amounts due, owing, and accrued under SOW#6, SOW#7, SOW#8, SOW#9, SOW#10, SOW#11, and SOW #12, including but not limited to, the amount currently due and payable of $729,050.00, plus such further interest, expenses, costs, and attorney's fees as the same have accrued and continue to accrue.

**Count III**

**ATTORNEYS' FEES AND LITIGATION COSTS AGAINST FISERV**

65.

The foregoing paragraphs of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

66.

The Service Agreement provides, *inter alia*, in Section 14.12 that if any action is brought to enforce the terms of the Services Agreement, the prevailing party shall be entitled to receive its reasonable costs, expenses and attorney's fees.

67.

Pursuant to O.C.G.A. § 13-1-11, Keystone has made demand upon FISERV for all amounts owing and advised that failure to pay the same will cause the provisions of the Services Agreement providing for attorneys' fees to be enforced.

68.

As of the date of this Complaint, FISERV has failed to pay Keystone the amounts outstanding under the Services Agreement.

69.

Keystone is entitled to recover from FISERV, its attorneys' fees and expenses in connection with enforcing its rights under the Services Agreement to the fullest extent permitted under O.C.G.A. § 13-1-11 and Georgia law.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in favor of Keystone and against FISERV as follows:

(a)      As to <u>Count I</u>:  Judgment against FISERV for breach of contract (the Services Agreement) in the total amount of $729,050.00, plus any such additional interest, fees, costs and charges as same accrue under the Services Agreement;

(b)      As to <u>Count II</u>:  Reimbursement by FISERV to Keystone for unjust enrichment, to the extent of the value conferred, which includes all amounts due, owing, and accruing under, the Service Agreement, in the amount of $729,050.00, plus any such further interest, expenses, costs, and attorney's fees as the same have accrued and continue to accrue;

(f)      As to <u>Count III</u>:  As to FISERV, an award of Keystone's attorneys' fees and expenses in connection with enforcing its rights under the Services Agreement to the fullest extent permitted under O.C.G.A. § 13-1-11 and Georgia law; and

(g)      Any and all other relief the Court deems just, equitable and proper.

Dated:  September 7, 2022.        Respectfully Submitted,


<u>/s/ Jack C. Lundstedt Jr.</u>
Jack C. Lundstedt Jr.
Georgia Bar Number 171676

**JCORBITT ADVISORY SERVICES**
655 Buttercup Trce
Alpharetta, GA 30022
Ph: 770-605-9244

*Attorney for Plaintiff, Keystone Solutions LLC*

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **KEYSTONE SOLUTIONS, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO.** _2022CV369921_ |
| **FISERV SOLUTIONS, LLC as converted from** | ) | |
| **FISERV SOLUTIONS, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## VERIFICATION

Personally appeared before the undersigned officer, duly authorized to administer oaths, Matthew Gellis, who, upon being duly sworn, deposes and states that he is Chief Executive Officer ("CEO") of Keystone Solutions, LLC, that he is authorized to make this Verification on behalf of Plaintiff, and that based upon his own personal knowledge, the facts contained within the foregoing VERIFIED COMPLAINT are true and correct.

_Matthew Gellis_
Matthew Gellis, CEO
KEYSTONE SOLUTIONS, LLC

Sworn to and subscribed before me
this 22 day of August, 2022.

_____
Notary Public
My Commission Expires: 5-30-23

DAVID WALTERS
NOTARY
EXPIRES
GEORGIA
05-30-23
PUBLIC
CHEROKEE COUNTY

- 14 -

# EXHIBIT "A"

## CONSULTING SERVICES AGREEMENT

This Consulting] Services Agreement (together with all of the exhibits, attachments, and SOWs hereto, this "**Agreement**") is entered into this 13th day of January, 2015 (the "**Effective Date**"), by and between Fiserv Solutions, Inc., a Wisconsin corporation having an office at 4411 East Jones Bridge Road, Norcross, Georgia 30092, on behalf of itself and its Affiliates ("**Fiserv**") and Keystone Solutions, LLC, a Nevada limited liability company, having its principal place of business at 12460 Crabapple Road, Suite 202 #114, Alpharetta, Georgia 30004 ("**Consultant**") (each a "**Party**"; together, the "**Parties**").

## ARTICLE 1:  DEFINITIONS

1.1    "**Affiliate**" shall mean an entity that controls, is controlled by, or is under common control with a Party, where "control" means the direct or indirect ownership of more than 50% of the voting securities of such entity or Party.

1.2    "**Auditable Records**" shall mean accurate auditable evidence maintained in any type of media, including, but not limited to, records, timesheets (or time tracking systems of any type), employment records, work specifications, project management notes and reports, consulting charges, invoices, travel and living expenses, receipts and employee expense records, which are the basis of, or otherwise relate to, any fees, expenses or other charges to Fiserv under any SOW for Services.

1.3    "**Change of Control**" shall mean:  (a) outstanding stock representing 33% or more of the voting rights of a Party's shareholders, or outstanding stock representing 50% or more of the equity ownership of a Party, or all or substantially all of a Party's assets are sold, transferred, assigned or merged; (b) a Party assigns (other than by a change in controlling interest or a sale of all or substantially all of its assets) to a third party any of its rights and obligations under this Agreement; (c) a Party sells a line of business or division that performs any Services hereunder whether by asset sale, stock sale, merger or otherwise; or (d) any other transaction or series of transactions that result in a change of Control of a Party.

1.4    "**Confidential Information**" shall mean material or information, in any form, which is confidential or proprietary to Disclosing Party and not generally known by third parties, whether or not designated as Confidential Information by Disclosing Party.  Confidential Information includes, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing and regardless of the form of media): systems manuals, decision processes, profiles, system and management architectures, discoveries, ideas, know-how, concepts or inventions (whether patented or not), software in various stages of development, business methods, processes, strategic plans or methodologies, marketing techniques and materials, marketing and development plans and procedures, Customer and Employee Data, price lists, pricing policies, business or financial information, plans, strategies, forecasts, forecast assumptions, trade secrets, and business practices.   Confidential Information also includes any:  (a) information described above which belongs to a third party, is disclosed to or access by Recipient hereunder, and with respect to which Disclosing Party owes a duty of confidentiality; (b) information which is jointly developed by the Parties and which either Party treats as proprietary or confidential; (c) information that, by its nature or the circumstances surrounding its disclosure, Recipient reasonably ought to know is confidential; and (d) notes, memoranda, analyses or abstracts relating to or containing Confidential Information.

1.5    "**Consultant Tools**" shall mean those ideas, concepts, methodologies, tools, materials, functionality, and expertise developed in the course of performing the Services that are of general application to Consultant's customers and do not include any Confidential Information of Fiserv.

1.6    "**Deliverables**" shall mean any ideas, know-how, documents, studies, materials, reports, data, plans, documentation, products, software (including source code and object code) or other materials in whatever form or any concept or design relating thereto developed in whole or part under any SOW or otherwise created by Consultant as a result of or related to the performance of the Services, including all intellectual property rights related thereto, but specifically excluding the Consultant Tools.

1.7    "**Disclosing Party**" shall mean the Party disclosing Confidential Information.

1.8     "**Intellectual Property**" shall mean, to the extent that any of the following are recognized in any jurisdiction world-wide: (a) intellectual property and/or proprietary rights, whether registered or unregistered, including without limitation copyrights and patent rights (including without limitation applications for patent protection); (b) publicity rights, trade dress, registered or otherwise protected trademarks, trade names, service marks and protections from trademark dilution; (c) trade secrets, as defined in the Uniform Trade Secret Act or its successor, or its equivalent in the applicable jurisdiction; and (d) proprietary products, services, know-how, techniques, business processes, configurations, and business methods.

1.9     "**Personnel**" shall mean any agent, employee, or subcontractor employed or retained in any way, on a full or part time basis, by Consultant or any of its Affiliates, as well as any employee or agent of a subcontractor of Consultant or any of its Affiliates.

1.10    "**Pre-existing Intellectual Property**" shall mean products, software, ideas, skills, tools, techniques, processes and other Intellectual Property of a Party which it can convincingly evidence through written documentation as its Intellectual Property to be in existence prior to the Effective Date.

1.11    "**Purchase Order**" or "**PO**" shall mean a purchase order issued by Fiserv to Consultant for the purchase of the Services.

1.12    "**Recipient**" shall mean the Party that receives or otherwise has access to Confidential Information of the other Party.

1.13    "**Services**" shall mean any implementation, conversion, training, consulting or other professional services provided by Consultant to Fiserv pursuant to this Agreement and one or more SOW(s).

1.14    "**Statement of Work**" or "**SOW**" shall mean a statement of work executed by Consultant and Fiserv pursuant to which Consultant will provide Services to Fiserv.

## ARTICLE 2: SERVICES

2.1     <u>Scope of Services</u>.   Consultant agrees to perform the Services, including providing any Deliverables, as set forth in or contemplated by any SOW.  Except as the Parties may expressly agree in writing, each SOW shall be governed in all respects by the terms and conditions of this Agreement.  In the event of conflict between this Agreement and a SOW, this Agreement shall control with respect to the subject matter thereof.

2.2     <u>Changes in Scope of SOW</u>.  Subject to any additional requirements described in an applicable SOW hereunder, either Party may propose changes to the scope of the SOW by delivery of a written notification to the other Party describing the desired changes ("**Change Request**").   If Consultant proposes the Change Request, then Consultant shall provide with the Change Request an estimate of the effect on cost and time of delivery associated with the Change Request.  If Fiserv proposes a Change Request, then Consultant shall promptly provide Fiserv an estimate of the effect on the cost and time of delivery associated with the Change Request.  Fiserv shall have the right to reject or approve, in its sole reasonable discretion, any Change Request proposed by Consultant.  No SOW will be modified or changed until the Parties agree upon a Change Request and execute a written change order ("**Change Order**") or other amendment to the applicable SOW.

2.3     <u>Performance Schedule; Delays</u>.  Any delay in the performance schedule caused by Consultant may impact the fee payment as described in a SOW.  If any delays in Consultant's performance occur as a result of a material failure to cooperate or untimely performance by Fiserv, Consultant shall not incur any liability for its non-performance under this Agreement as a result of such delay.

2.4     <u>Acceptance of Deliverables</u>.  Unless a particular SOW provides otherwise, following receipt of a Deliverable or performance of Services, Fiserv shall have fifteen (15) business days ("**Review Period**") to review and accept such Deliverable or Services.  If Fiserv identifies in writing any nonconformity with respect to the Deliverables or Services within such Review Period, then Consultant shall have no more

than 10 days in which to remedy all material defects, after which, if such defects are not cured in Fiserv's reasonable opinion, Fiserv may, at its option, terminate this Agreement and/or any outstanding SOWs immediately without further payment obligation  and receive a refund of any amounts already paid with respect to such Deliverables and Services. If Fiserv fails to give a statement of nonconformity within the Review Period, Fiserv will be deemed to have accepted the Deliverables or Services as of the expiration of the Review Period.

2.5     Assignment of Personnel; Subcontracting.

      (a)     Consultant shall consult with Fiserv in determining which of its employees and/or other personnel shall be assigned to perform the Services hereunder.  Consultant shall not replace or reassign such person(s) during the term of the applicable SOW without Fiserv's prior written consent.  If Fiserv believes that any individual assigned by Consultant to perform the Services is not in the best interests of Fiserv, then Fiserv shall have the right to request a replacement for such individual.  If the problem cannot be resolved within five (5) days after such request by Fiserv, then Consultant shall replace such individual with another individual, who, to the reasonable satisfaction of Fiserv, possesses the skills and experience necessary to provide the Services and Deliverables.  Upon request from Fiserv, Consultant shall identify all Personnel performing any Services hereunder.  In no event shall Consultant assign or permit any former Fiserv employee to perform Services for Fiserv (or otherwise have access to any Fiserv information or data) without Fiserv's prior written consent.

      (b)     Consultant may not subcontract the performance of the Services without the prior written approval of Fiserv.  If Fiserv so approves, then Consultant shall assume all liability and responsibility for all acts and omissions of such subcontractor.  All subcontractors approved by Fiserv shall: (i) comply with all laws and regulations issued that are applicable to Consultant and such subcontractor's performance of the Services; and (ii) abide by all of the terms and conditions of this Agreement and any applicable SOW.

2.6     Fiserv Affiliates.  Any Affiliate of Fiserv may execute SOWs under this Agreement in its sole discretion.  In that event, all references to "Fiserv" herein shall refer to such Affiliate for purposes of the applicable SOW.

## ARTICLE 3:  COMPENSATION; TAXES

3.1     Fees.  Fiserv will pay Consultant the amount specified in each SOW or PO, as applicable, for all Services performed thereunder.

3.2     Invoices.

(a)     Consultant will invoice Fiserv in accordance with the applicable SOW or PO or, if not specified in the SOW or PO, then on a monthly basis for charges incurred for Services rendered during the preceding month.  Consultant agrees to issue invoices and accept PO's through the electronic procurement tool designated by Fiserv.

      (b)     Unless otherwise agreed to in a SOW, or specified by Fiserv in a PO, all invoices must:

            (i)     be sent to the address set forth in the SOW or PO, or otherwise provided by an authorized representative of Fiserv;

            (ii)     reference any applicable number set forth in the SOW or PO;

            (iii)     include a detailed description of the Services performed (including the names of individuals performing Services where the Services are being performed on a time and materials ("T&M") basis);

            (iv)     include the performance period(s) and relevant dates;

            (v)     include reimbursable expenses (including specific categories for airfare, accommodations, transportation and meals), if applicable;

     (vi)     reference the applicable Fiserv business representative; and

     (vii)    include a unique invoice number.

     (c)     Fiserv reserves the right to reject and return for correction any invoice that: (i) does not reflect the required information; (ii) is sent to an address other than as authorized in subsection (b)(i) above; or (iii) does not conform to Fiserv invoicing terms as specified in this Agreement or an applicable SOW or PO.

3.3    <u>Payment</u>. At Fiserv's discretion, payments may be made via EFT. All invoices submitted by Consultant shall be due and payable within forty-five (45) days of receipt of a correct invoice, except as otherwise set forth in Section 3.5 below. In the event that Fiserv is in default of its payment obligations under this Agreement or any SOW, Consultant reserves the right to withhold Services or delivery of any work in process or Deliverables until such default has been cured.

3.4    <u>Taxes</u>. Fiserv is responsible for any legally required sales and use tax on Services covered in this Agreement. Consultant shall indicate on the invoice the amount of such tax and the jurisdiction to which the tax will be remitted. In the event Fiserv reasonably disagrees with the applicability of any invoiced taxes, Fiserv shall have the right to reduce the invoice by the amount of such taxes. In no event shall Fiserv be responsible for taxes based on Consultant's net or gross income, capital, property or employees, nor shall Fiserv be responsible for any penalties, fines, or interest resulting from Consultant's improper or untimely collection or remittance of taxes. Where required by law, Fiserv may withhold from payment any taxes which it is required to pay in connection with its purchases under this Agreement. In the event Fiserv enjoys any tax exemptions, provided that Fiserv provides reasonable evidence of such exemption(s), Consultant shall honor such exemption(s). In the event Fiserv reasonably disputes a tax hereunder, Consultant shall reasonably cooperate with Fiserv in disputing any such tax and/or seeking to recover any such tax from any taxing authority.

3.5    <u>Disputes</u>. If there exists a good faith dispute with regard to an item appearing on an invoice, Fiserv has the right to withhold such disputed amount while the Parties attempt to resolve the dispute in accordance with Article 8, provided that Fiserv provides Consultant with written notice of such dispute on or before the due date of the disputed invoice. Fiserv's withholding of such disputed amount shall not constitute a breach of this Agreement, nor shall it be grounds for Consultant to suspend or terminate its performance of Services, so long as Fiserv pays on a timely basis those amounts that are undisputed.

3.6    <u>Expenses</u>. Unless otherwise agreed upon in a SOW, Fiserv will not reimburse Consultant for travel or other expenses incurred by Consultant or any Personnel in connection with providing Services under this Agreement. If such expenses are to be reimbursed, they must be pre-approved in writing by Fiserv and comply with Fiserv's Third Party Business Travel and Expense Policy, a copy of which will be provided upon request. All expenses shall be itemized on invoices submitted by Consultant.

### ARTICLE 4: CONFIDENTIAL INFORMATION AND SECURITY

4.1    <u>Disclosure and Use</u>.

     (a)     Recipient may be given access to Disclosing Party's Confidential Information. Recipient will protect Disclosing Party's Confidential Information from any unauthorized use, disclosure, copying, dissemination or distribution as it would protect its own Confidential Information, which shall be by no means less than a reasonable degree of care and as required by law. Recipient will only use the Confidential Information for the following "**Permitted Purposes**": (i) to perform its obligations under this Agreement; and, (ii) in the case of Fiserv, to derive the reasonable and intended benefit of the Services and Deliverables provided pursuant to this Agreement. Recipient will only disclose Confidential Information those of its and its Affiliates' employees, agents, contractors, and subcontractors who have a direct "need to know" for a Permitted Purpose and who are subject to written obligations of confidentiality which are no less restrictive than those contained herein. Recipient shall be responsible for any breach of this Article 3 by any such individuals or entities. Recipient will notify Disclosing Party as soon as

possible of any misuse of or unauthorized access to Confidential Information of which it becomes aware and will cooperate in remedying such situation promptly.

(b)      Recipient may disclose Confidential Information to the extent required by law or legal process, provided that:  (i) Recipient first gives Disclosing Party prompt notice, if legally permissible, so that Disclosing Party may seek a protective order; (ii) Recipient reasonably cooperates with Disclosing Party (at Disclosing Party's expense) in seeking such protective order; (iii) if Disclosing Party cannot obtain a protective order, Recipient only discloses the Confidential Information that in the reasonable opinion of its legal counsel is required to be disclosed; and (iv) all such Confidential Information required to be disclosed shall remain subject to the obligations in this Agreement.

(c)      As between the Parties, all Confidential Information is the property of Disclosing Party. This Agreement will not be interpreted or construed as granting any license or any other Intellectual Property right to Recipient for any Confidential Information.

(d)      Recipient will comply with any and all applicable laws relating to the use, disclosure, copying, dissemination and distribution of any Confidential Information (including, but not limited to, any and all laws relating to proprietary rights or the export of any technical data included in such Confidential Information).

(e)      Upon the request of Disclosing Party, Recipient shall promptly return to Disclosing Party or destroy all Confidential Information; in either case, any and all copies of Confidential Information will be destroyed.  Recipient will provide a written affidavit certifying that all Confidential Information has been returned or destroyed in compliance with this Section 4.1(e).

(f)      Recipient will not alter, remove or obliterate markings (if any) on Confidential Information indicating its ownership, proprietary or confidential nature.

4.2      <u>Exclusions</u>.  Confidential Information will not include information which (as evidenced by written documentation):

(a)      is or becomes available to the general public through no fault of Recipient;

(b)      is developed by Recipient without breach of this Agreement or aid of Disclosing Party's Confidential Information; or

(c)      is rightfully received by Recipient through no breach of confidentiality obligation from a third party without a duty of confidentiality.

4.3      [Intentionally Omitted.]

4.4      <u>Equitable Relief</u>.  Disclosing Party may suffer irreparable harm in the event that Recipient fails to comply with the terms of this Agreement.  Monetary damages may be inadequate to compensate for such breach.  Accordingly, in addition to any other remedies available to it at law or in equity, Disclosing Party shall be entitled to seek injunctive relief to enforce the terms of this Agreement without the requirement of having to post bond.

## ARTICLE 5: OWNERSHIP; IP MATTERS

5.1      Unless otherwise expressly set forth in a SOW, Fiserv will own all Intellectual Property rights in any Deliverables, and all Deliverables are deemed "works made for hire."  Consultant and Fiserv each acknowledge that the performance of the Services may result in the discovery, creation and development of Deliverables.  Delivery to Fiserv shall constitute a transfer to Fiserv by Consultant of all Intellectual Property rights therein.  All Deliverables discovered, created or developed under this Agreement shall be and remain the sole and exclusive property of Fiserv.  In the event Deliverables do not fall within the specifically enumerated works that constitute "works made for hire" under United States copyright laws, Consultant hereby assigns all tangible and intangible Intellectual Property and other right title and interest in the Deliverables to Fiserv.  Consultant agrees to execute any other documents necessary to perfect

title in any Deliverable for Fiserv.  Further:  (a) Consultant will retain all right, title and interest to its Pre-existing Intellectual Property and Consultant Tools; (b) to the extent that Pre-existing Intellectual Property or Consultant Tools have been incorporated into or is embedded in the Deliverables, Fiserv will have a perpetual, nonexclusive, non-terminable, world-wide, royalty-free right to use, execute, modify, reproduce, display, perform, and prepare derivative works based on such Pre-existing Intellectual Property and Consultant Tools to support and make full use of the Deliverables; (c) Consultant will promptly and fully disclose to Fiserv any and all work for hire and Deliverables generated, conceived, reduced to practice or learned by Consultant or Personnel, either solely or jointly with others, during the Term of this Agreement, which in any relates to the business or operations of Fiserv; and (d) neither Consultant nor its Personnel shall use or disclose any information relating to Deliverables except as necessary in the performance of the Services.  Any modifications, improvements, or amendments to any Consultant Pre-existing Intellectual Property or Consultant tools will be solely owned by Consultant only if such improvements, amendments, or modifications are not included or incorporated in any way in any Deliverables.

5.2      Consultant shall not, without the prior written consent of Fiserv, introduce, embed, or utilize any third party software or other intellectual property ("**Third Party Material**") in any Deliverable, or in the performance of the Services hereunder.  To the extent Fiserv provides such consent, Consultant hereby grants Fiserv and its Affiliates a perpetual, fully paid up, royalty-free, non-exclusive, world-wide, irrevocable license to use such Third Party Material for the benefit of Fiserv and its Affiliates in connection with the use of the Deliverables created hereunder, and the Parties will mutually agree on applicable terms for support of any such Third Party Material after expiration or termination of this Agreement. Consultant shall be responsible for any fees, expenses or costs resulting from its embedding of any Third Party Material within any Deliverables provided or developed under this Agreement.

5.3      In the event that the Parties expressly agree in a SOW that Consultant will own of all or some portion of the Deliverables, then with respect to such Deliverables, the terms set forth in this Section 5.3 shall apply.  Consultant hereby grants to Fiserv and its Affiliates a global, royalty-free, fully paid-up, non-exclusive, and perpetual right and license to use, execute, modify, reproduce, display, perform, and prepare derivative works based on such Deliverables to support and make full use of the Deliverables. For the avoidance of doubt,  Fiserv does not grant, assign or in any way transfer any right, entitlement, privilege, permission, claim, title, ownership or interest in any of its Intellectual Property or other Confidential Information, either implicitly or explicitly, by operation of law or otherwise.

## ARTICLE 6:  CONSULTANT RESPONSIBILITIES

6.1      Publicity.  Consultant will not use the name(s), trademark(s) or trade name(s) of Fiserv or its Affiliates without Fiserv's prior written consent.  Consultant shall not use Fiserv's or its Affiliates' name(s), logo(s), trademark(s) or other symbol(s) in advertising or publicity releases or publicly distributed materials, including, without limitation, customer lists or links to any Fiserv website, without Fiserv's prior written consent.  Such prior written consent may only be granted by an Executive Vice President or Senior Vice President of Fiserv.  Furthermore, Consultant shall not claim or suggest, implicitly or explicitly, that Fiserv's or its Affiliates' use of the Software or Services constitutes an endorsement by Fiserv or any of its Affiliates of such Software or Services.

6.2      Legal Status/Regulatory Changes.  Consultant shall notify Fiserv, in writing, as soon as reasonably practicable upon becoming aware of any regulatory issues, arbitration, or litigation, pending or active, that may affect Consultant's performance under this Agreement or any SOW.

6.3 Screening Procedures.

(a)      APPLICATION.  The screening procedures set forth in subsection (b) shall apply to all Personnel who: (i) have access to any of Fiserv's Confidential Information; (ii) have the ability to manipulate Fiserv's finance or accounting data; (iii) have access to Fiserv's networks or systems; or (iv) perform Services on Fiserv's premises without supervision by a Fiserv associate.  Consultant shall cause to be performed, at its sole expense, each of the following checks and screenings on all such Personnel prior to the start of their assignment with Fiserv.  Such screenings shall have been performed within five years of the date on which such Personnel commences an assignment with Fiserv, and the criminal convictions search shall be re-performed every five years.

(b)    <u>PROCEDURES</u>.

    (i)    <u>Criminal History Report</u>.  A criminal convictions search for the preceding seven year period shall be conducted.  Subject to applicable law, no Personnel who have been convicted of or accepted responsibility for a felony of any type or a misdemeanor involving theft, fraud, embezzlement, or money laundering or which is otherwise related to dishonesty or a breach of trust shall be assigned to, or permitted to continue an assignment with, Fiserv.

    (ii)    <u>Drug Test</u>.  A drug test, which shall consist of a 10 panel urinalysis test, shall be conducted at a laboratory certified by the Substance Abuse and Mental Health Services Administration (SAMHSA).  Any Personnel with a confirmed positive test will be denied assignment to Fiserv.

    (iii)    <u>Global Watch List</u>.  A check against the U.S. Treasury's Office of Foreign Assets Control's (OFAC), "Specially Designated Nationals and Blocked Persons" (SDN) database shall be conducted, and any Personnel appearing in such database shall not be assigned to, or permitted to continue an assignment with, Fiserv.

(c)    <u>MONITORING</u>.  In the event that Consultant becomes aware of a fact or circumstance following the date of assignment to Fiserv which would have resulted in Personnel failing to pass one of the foregoing screening procedures (e.g., if the person is convicted of a felony after the date of his or her assignment to Fiserv), Consultant shall immediately remove such Personnel from Fiserv's account, project, and/or premises, as appropriate, and no longer permit such Personnel to perform Services for Fiserv.  From time to time, upon Fiserv's request, Consultant shall provide Fiserv with documentation or other evidence reasonably acceptable to Fiserv to evidence that it has complied with the foregoing provisions.

6.4    <u>Fiserv Policies and Procedures</u>.  While performing the Services, Consultant will abide by Fiserv's then-current standard safety and security procedures and policies, as Fiserv has provided to Consultant in writing from time to time.  When assigned to perform work at a Fiserv location, all Personnel will also comply with Fiserv's policies regarding dress and appearance, professional conduct and any other reasonable work rules, regulations and instructions applicable to Fiserv employees generally, as Fiserv has provided to Consultant in writing from time to time.

6.5    <u>Consultant Hardware & Software</u>.  Consultant will not bring any hardware or software onto Fiserv's premises unless such items are necessary for Consultant to perform Services under this Agreement.  All such hardware and software is subject to inspection and/or scanning by Fiserv before Consultant may use said items on Fiserv's premises.  Consultant will obtain approval from and comply with the directives provided by Fiserv prior to connecting any hardware to Fiserv's systems or network.

6.6    <u>Services Re-performance</u>.  In the event Fiserv notifies Consultant that the delivery of Services is not acceptable, Consultant shall promptly at its expense, and at Fiserv's option, either:  (a) re-perform the Services; or (b) reduce the invoiced cost of said Services in order to compensate Fiserv for any cost incurred by Fiserv to accomplish the task that has been impacted by the unacceptable performance of Consultant.

6.7    <u>Use of Fiserv Equipment</u>.  Fiserv may lend to Consultant the following for use during the Agreement (collectively referred to as "**Fiserv Equipment**"):  (a) a laptop computer ("**Fiserv Laptop**"); (b) a Multi-Factor Authentication (MFA) token; and/or (c) an access badge ("**Badge**").  Consultant agrees to: (i) store and process Confidential Information in electronic form only on the Fiserv Laptop; (ii) promptly transfer to the Fiserv Laptop any Confidential Information in electronic form that Consultant has previously stored elsewhere and securely and permanently delete it from its previous location; (iii) use the Fiserv Equipment only for performing Consultant's obligations under this Agreement; (iv) refrain from installing any software or hardware (including USB flash drives or external storage devices) on the Fiserv Laptop except to accomplish (ii) above or as otherwise specifically authorized by Fiserv in writing;  (v) keep the login IDs and passwords confidential; (vi) keep the Fiserv Equipment physically secure at all

times, locked up when not in Consultant's personal possession, and never checked as baggage on a flight; (vii) immediately inform Fiserv if the Fiserv Equipment is ever stolen, lost or missing; and (viii) complete a security awareness online course provided by Fiserv within two weeks of Consultant's engagement and annually thereafter.

## ARTICLE 7:  TERM AND TERMINATION

7.1     Term.  This Agreement shall commence on the Effective Date and shall continue for one year from the Effective Date (the "**Initial Term**"), and shall automatically renew for successive one year terms (each, a "**Renewal Term**") unless Fiserv provides Consultant with written notice of its intent to not renew this Agreement at least 30 days prior to the expiration of the Initial Term or then-current Renewal Term, as applicable.  The Initial Term, taken together with any Renewal Term(s), shall constitute the "**Term**." Notwithstanding anything to the contrary herein, this Agreement shall remain in effect for so long as there is a SOW in effect.  Each SOW may set forth a term applicable solely to that SOW ("**SOW Term**"). Fiserv, in its discretion, may extend a SOW Term on an open ended engagement or temporary engagement by written notice, so long as the Parties agree on a weekly or monthly cap on the hours that can be performed by Consultant or fees that can be invoiced by Consultant under such engagement.

7.2     Termination for Cause.  Either Party may terminate this Agreement or any SOW for cause immediately upon written notice as follows:

        (a)     for the other Party's failure to materially comply with the terms of this Agreement or a SOW (provided such breach, if capable of being cured, is not cured within 30 days after written notice is provided to the other Party); or

        (b)     in the event the other Party becomes or is declared insolvent or bankrupt, is the subject of any proceedings relating to its liquidation, insolvency, or for the appointment of a receiver or similar officer for it, makes an assignment for the benefit of all or substantially all of its creditors or enters into an agreement for the composition, extension or readjustment of all or substantially all of its obligations.

7.3     Additional Right of Termination.  Fiserv may also terminate this Agreement or any SOW immediately upon written notice as follows upon a Change of Control of Consultant.

7.4     Termination for Convenience.  Fiserv may terminate this Agreement or any SOW for convenience upon 10 days written notice to Consultant.

7.5     Prepaid Fees.  In the event Fiserv terminates this Agreement or a SOW for any reason, Consultant shall reimburse Fiserv for all unearned fees which were prepaid by Fiserv.

## ARTICLE 8:  DISPUTE ESCALATION

Before initiating arbitration or other legal action against the other relating to a dispute herein, the Parties agree to work in good faith to resolve disputes and claims arising out of this Agreement.  To this end, either Party may request that each Party designate an officer or other management employee with authority to bind such Party to meet to resolve the dispute or claim.  If the dispute is not resolved within 30 days of the commencement of informal efforts under this paragraph, either Party may pursue formal dispute resolution.  This paragraph will not apply if expiration of the applicable time for bringing an action is imminent and will not prohibit a Party from pursuing injunctive or other equitable relief to which it may be entitled.

## ARTICLE 9:  WARRANTY

9.1     Consultant Warranties.  Consultant warrants that:

        (a)     All Services performed by Consultant (including Personnel) pursuant to this Agreement shall be performed in a professional and workmanlike manner using due care and consistent with the standards of Consultant's industry, using appropriately trained and qualified personnel;

(b)     The Services and Deliverables shall conform in all respects to the specifications and requirements set forth in the applicable SOW.  If any of the Services or Deliverables fail to so conform, Consultant shall remedy such non-conformity in a prompt manner;

(c)     Neither Consultant's performance of the Services nor the Deliverables shall infringe nor cause the Services or Deliverables to infringe any copyright, patent, trade secret or other intellectual property right of any third party;

(d)     Consultant will not use in the performance of the Services or bring to Fiserv, any confidential or proprietary information, knowledge or data belonging to a third party;

(e)     Consultant's performance of all the terms of this Agreement and each SOW will not result in a breach of any agreement to keep in confidence information, knowledge or data acquired by Consultant in confidence or in trust including without limitation, proprietary information, knowledge or data acquired by Consultant in confidence or trust prior to its consulting engagement with Fiserv;

Consultant shall perform the Services and all of its obligations under this Agreement and each SOW in accordance with all applicable laws and regulations pertaining to either the Services or Deliverables provided, or the data or other information with which Consultant comes into contact; including, but not limited to (i) applicable privacy and data security laws and regulations; and (ii) Consultant agrees that it shall abide by the requirements of Executive Order 11246, 41 CFR §§60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment qualified individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability.

9.2     <u>Authority</u>.  Each Party warrants that:  (a) it is validly existing and in good standing under the laws of the state of its incorporation; (b) the execution, delivery, and performance of this Agreement have been duly authorized by such Party and this Agreement is enforceable upon its terms against such Party; and (c) no approval, authorization, or consent of any governmental or regulatory authorities is required to be obtained or made by such Party in order for it to enter into and perform its obligations under this Agreement.

9.3     <u>Disclaimer</u>.  OTHER THAN AS EXPRESSLY CONTAINED HEREIN OR IN A SOW, THERE ARE NO WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE AND THE SERVICES AND THE DELIVERABLES PROVIDED UNDER THIS AGREEMENT OR ANY SOW ARE PROVIDED "AS IS." EXCEPT AS PROVIDED HEREIN, CONSULTANT DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE USE OR THE RESULTS OF THE USE OF ANY CONTENT OBTAINED IN TERMS OF ITS CORRECTNESS, ACCURACY, RELIABILITY, OR OTHERWISE. CONSULTANT HAS NO RESPONSIBILITY WHATSOEVER FOR ANY CHANGES TO THE DELIVERABLES OR THE SERVICES THAT ARE MADE BY FISERV OR ANY OTHER THIRD-PARTY.

## ARTICLE 10: INDEMNITY

10.1     <u>General Indemnity</u>.  Consultant agrees to defend, indemnify and hold Fiserv, its Affiliates, and its and their respective directors, officers, members, employees, customers, and agents (collectively, the "**Fiserv Indemnitees**") harmless from and against all claims, actions, suits or proceedings (collectively, "**Claims**"), and shall pay all resulting losses, liabilities, damages, settlement amounts costs or expenses (including reasonable attorneys' fees actually incurred) (collectively, "**Losses**"), incurred by any Fiserv Indemnitee arising out of or relating to any actual or alleged:

(a)     personal injury, death, or damage to real or tangible property arising from any act or omission of Consultant or any Personnel; and

(b)      claims for any taxes, wages, or benefits brought by any Personnel.

Fiserv agrees to defend Consultant, its Affiliates, and its and their respective directors, officers, members, employees, customers, and agents (collectively, the "**Consultant Indemnitees**") from and against all third-party Claims and shall pay all resulting Losses incurred by any Consultant Indemnitee arising out of or relating to any personal injury, death, or damage to tangible property arising from Fiserv's gross negligence or willful misconduct.

10.2     Intellectual Property Indemnity. Consultant shall defend, indemnify and hold the Fiserv Indemnitees harmless from and against all Claims and shall pay all resulting Losses incurred by the Fiserv Indemnitees arising from the actual or alleged infringement of any Intellectual Property right (including the misappropriation thereof) belonging to any third party by:   (a) the Services and/or Deliverables; and/or (b) a Fiserv Indemnitee's use of the Services and/or Deliverables.

10.3     Additional Remedies for Alleged Infringement. Consultant will give Fiserv prompt written notice of any threat, warning or notice of any Claim against Consultant or components of the Services or Deliverables which could have an adverse impact on Fiserv's use thereof, provided Consultant knows or has reason to know of such Claim.  Should Fiserv's use of the Services or any Deliverables furnished hereunder be restricted, encumbered, or enjoined by reason of any such actual or alleged infringement, Consultant shall promptly and at no cost to Fiserv:  (a) obtain for Fiserv the right to continue to use the Services or Deliverables; (b) modify the Services or Deliverables so as to remove the cause of the Claim (provided that Consultant's modification will not affect Fiserv's intended use of the Services or Deliverables or degrade the quality or functionality thereof); or (c) replace the Services or Deliverables with equally suitable, non-infringing Services or Deliverables which will be subject to the provisions of this Agreement.  If option (a), (b), or (c) is not available to Consultant, then:  (i) Fiserv shall have the right to immediately terminate the Agreement or the applicable SOW; and (ii) Consultant shall provide a refund of any fees paid for the Deliverable, including fees paid for the Services related to such Deliverable.  The foregoing remedies will not limit any of Fiserv's other rights or remedies or limit or affect Consultant's obligations as otherwise set forth in this Agreement

10.4     Intellectual Property Indemnity Exclusions.  Consultant shall have no obligation to indemnify the Indemnitees pursuant to Section 10.2 to the extent the Claim is a result of, and would not have occurred but for:  (a) a modification of the Services or Deliverable, except a modification made or approved by Consultant or its Personnel; or (b) use of the Services or Deliverable in violation of the applicable SOW.

10.5     Conduct of Defense.  The indemnifying party shall assume and have the right to conduct:  (a) the defense of any Claim for which the indemnified party seeks indemnification pursuant to this Article 10; and (b) all negotiations for settlement or compromise unless otherwise mutually agreed to in writing between the Parties hereto, provided that the indemnifying shall not have the right to:  (i) execute any agreement, document or pleading that names an indemnified party as a party; (ii) make statements regarding any indemnified party without such party's prior written consent, which consent will not be unreasonably withheld or delayed; or (iii) settle any claim that in any way assesses blame against any indemnified party or that provides a remedy other than the payment of money without such indemnified party's prior written consent.

10.6     Notice.  The indemnified party agrees to give the indemnifying party prompt notice of any written threat, warning, or notice of any Claim for which an indemnified party intends to seek indemnification and copies of all papers served upon or received by it relating to the same, however, no delay on the part of an Indemnitee in notifying the indemnifying party shall relieve the indemnifying party from any obligations hereunder unless, and then solely to the extent that, the indemnifying party is materially prejudiced thereby.   The indemnified party agrees to provide reasonable assistance and information to the indemnifying party (at the indemnifying party's expense) regarding the defense of any Claim.

## ARTICLE 11:  LIMITATION OF LIABILITY

11.1     Liability Limitation and Exclusions.

(a)     EXCEPT AS OTHERWISE SET FORTH IN SUBSECTION (c) BELOW, IN NO EVENT SHALL EITHER PARTY OR ITS AFFILIATES BE LIABLE FOR INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES WHATSOEVER (COLLECTIVELY, "**Indirect Damages**"), WITHOUT REGARD TO CAUSE OR THEORY OF LIABILITY, REGARDLESS OF WHETHER SUCH DAMAGES ARISE OUT OF THIS AGREEMENT OR THE SERVICES OR DELIVERABLES PROVIDED HEREUNDER, AND EVEN IF SUCH PARTY OR ITS AFFILIATE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b)     Except as otherwise set forth in subsection (c) below, each Party's aggregate liability to the other Party or any third party for any and all claims or obligations relating to this Agreement shall be limited to the total fees paid by Fiserv to Consultant under this Agreement (the "**Damages Cap**"), except that this subsection (b) shall not limit the fees which are due to Consultant for Services performed hereunder or any refunds which Consultant may owe to Fiserv hereunder.

(c)     Notwithstanding the limitations set forth in subsections (a) and (b), there shall be no limit of liability with respect to the following:  (i) Consultant's indemnification obligations; (ii) damages which are related to, or arise from, personal injury, death, or damage to tangible property arising from an act or omission of Consultant or any Personnel; (iii) damages which arise from a breach by Consultant or any Personnel of its confidentiality or security obligations, as set forth in Article 4 hereto; (iv) damages which arise from Consultant's or any Personnel's gross negligence or willful misconduct; or (v) damages which arise from a Consultant's or any Personnel's misappropriation or misuse of software, code, or other Intellectual Property owned by or licensed to Fiserv.

11.2     Limitations Period.  Except with respect to Consultant's indemnification obligations or claims related to Confidential Information, neither Party may assert any claim against the other related to this Agreement more than two years after such claim accrued.

## ARTICLE 12:  INSURANCE REQUIREMENTS

During the Term of this Agreement, Consultant and its approved subcontractors shall secure and maintain, each at its own expense, insurance of the types and with limits not less than those set forth in Exhibit A hereto.

## ARTICLE 13:  NON-COMPETE

[Intentionally Omitted.]

## ARTICLE 14:  GENERAL PROVISIONS

14.1     Entire Agreement. This Agreement constitutes the entire understanding and agreement between the Parties with respect to the transactions contemplated herein and supersedes any and all prior and contemporaneous oral or written communications or agreements with respect to the subject matter hereof.  No usage of trade, or other regular practice or method of dealing between the Parties hereto or others, will be used to modify, interpret, supplement, or alter in any manner the express terms of this Agreement.  The SOWs entered into under this Agreement, and the Exhibits attached hereto, are incorporated herein by reference and are integral parts of the Agreement.  To the extent that there are any conflicts between the terms and conditions in any SOW and those contained in this Agreement (unless explicitly stated to the contrary in the SOW), the terms and conditions set forth in this Agreement shall control.  If any document issued by Consultant includes any reference that is inconsistent with the provisions of this Agreement, such references shall be null and void despite no objection being stated by Fiserv.

14.2    <u>Modification of Agreement</u>.  Neither this Agreement nor any SOW may be modified or amended except by a written document which is executed by an authorized representative of each of Fiserv and Consultant.

14.3    <u>Severability</u>.  Each provision of this Agreement is severable.  If any court with jurisdiction over the Parties and the subject matter determines that any provision(s) of this Agreement is invalid or unenforceable, such provision(s) shall be deemed stricken, and the remainder of the Agreement shall continue in full force and effect insofar as the Agreement remains a workable instrument to accomplish the intent and purposes of the Parties. If practicable, the Parties will promptly replace the severed provision(s) with a mutually acceptable valid, legal, and enforceable provision that reflects the intentions of the Parties underlying the severed provision(s), provided that a failure to find such an acceptable substitute shall not affect the applicability of the first sentence of this Section 14.3.

14.4    <u>No Exclusivity</u>.  Nothing herein shall restrict Fiserv's right to contract with any third party to provide products and/or services similar to or identical to the Services provided under this Agreement. Furthermore, there is no requirement that any minimum level of business or fees be provided to Consultant by Fiserv.

14.5    <u>Survival</u>.  The provisions of this Agreement which by their nature are intended to survive the termination, cancellation, completion or expiration of the Agreement shall continue as valid and enforceable obligations of the Parties notwithstanding any such termination, cancellation, completion or expiration.  Without limiting the foregoing, the provisions regarding confidentiality, indemnity, and limitations of liability shall survive the expiration or termination of this Agreement.

14.6    <u>Independent Contractor</u>.  The Parties agree that each is performing its obligations hereunder as an independent contractor.  Nothing contained in this Agreement, nor any action taken by any Party to this Agreement, shall be deemed to constitute Consultant (including any Personnel) an employee or legal representative of Fiserv.  Consultant, in performance of Services provided hereunder, is acting as an independent contractor.  Personnel who are located or perform Services at Fiserv facilities shall remain Personnel of Consultant, Consultant shall have sole responsibility for such Personnel, and Consultant shall pay any and all assessments and employment taxes in connection with the Services and Personnel. **Personnel supplied by Consultant hereunder are not Fiserv's employees or agents, and Consultant assumes full responsibility for Personnel's acts.  Consultant shall be solely responsible for the payment of** compensation of the Personnel assigned to perform Services hereunder, and Personnel shall not be eligible for or participate in any way with Fiserv benefit plans.  Fiserv shall not be responsible for payment **of worker's compensation, disability benefits, unemployment insurance and for withholding income taxes** and social security for any Personnel, and Consultant shall indemnify and hold Fiserv harmless from any such Claims by Personnel against Fiserv or its Affiliates.

14.7    <u>No Agency</u>.  Nothing in this Agreement shall be deemed to create any partnership, joint venture, association, or syndicate among or between the Parties, nor to confer on Consultant any express or implied right, power or authority to enter into any agreement or commitment on behalf of (nor to impose any obligation upon) Fiserv.  Consultant shall have no authority to act for or on behalf of Fiserv or to represent Fiserv in any transaction, except to the extent such authority is expressly granted in this Agreement, or otherwise in writing, by Fiserv to Consultant.  Any action taken by Consultant that is not permitted by the provisions of this Agreement or otherwise by Fiserv shall not bind Fiserv or create any claim against the assets of Fiserv.

14.8    <u>Governing Law; Jury Trial Waiver</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of New York.  Any legal action or proceeding relating to this Agreement may be instituted in a state or federal court in Milwaukee County, Wisconsin or in the Federal District Court for the Eastern District of Wisconsin.  Fiserv and Consultant agree to submit to the jurisdiction of, and agree that venue is proper in, these courts in any such action or proceeding.  Both Parties agree to waive any right to have a jury participate in the resolution of any dispute or claim between the Parties or any of their respective Affiliates arising under this Agreement.

14.9    <u>Non-Waiver</u>.  The waiver by either Party of any breach or default by the other Party of any of term of this Agreement will not be deemed to be a waiver of any subsequent breach or default under the same

or any other term of this Agreement.  Likewise, neither the failure nor any delay on the part of either Party in exercising any right under this Agreement or any SOW shall operate as a waiver thereof.  Any remedy provided for in this Agreement is non-exclusive and in addition to all other remedies available to at law, by statute or in equity.  All remedies available hereunder are cumulative.

14.10   <u>No Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties hereto and nothing herein, express or implied, shall give or be construed to give any rights hereunder to any third party.  Neither this Agreement nor the Parties hereto intend to confer a third party beneficiary right of action upon any person or entity whatsoever, and nothing in this Agreement will be construed so as to confer upon any person or entity, other than the Parties hereto, a right of action either under this Agreement, or otherwise, in any manner whatsoever.

14.11   <u>Force Majeure</u>.  If either Party cannot perform any of its obligations because of any act of God, court order, fire, riot, war, or any and other causes beyond a Party's reasonable control and which it could not have prevented by reasonable precautions (a **"Force Majeure Event"**), then the non-performing Party will:  (a) immediately notify the other Party; (b) take reasonable steps to resume performance as soon as possible; and (c) not be considered in breach during the duration of the Force Majeure Event.  In the event a Force Majeure Event continues for a period of five business days, Fiserv may terminate this Agreement by providing written notice to Consultant.  Fiserv's requirement to pay for Sevices and/or Deliverables affected during a Force Majeure Event shall be suspended until Services are resumed in accordance with the terms of this Agreement. Notwithstanding the foregoing, a Force Majeure Event shall not relieve Consultant of its disaster recovery obligations.  Notwithstanding the foregoing, under no circumstances shall any delay or failure to perform be excused or forgiven:  (i) if the cause of the delay or failure could have been prevented or avoided by the exercise of all due diligence; or (ii) if the Party whose performance is delayed or prevented fails to use all due diligence to promptly overcome and/or mitigate the delay or failure to perform.

14.12   <u>Prevailing Party</u>. The prevailing Party in any arbitration, suit, or action brought by one Party against the other Party to enforce the terms of this Agreement or any rights or obligations hereunder, shall be entitled to receive its reasonable costs, expenses, and attorneys' fees of bringing or defending such arbitration, suit, or action.

14.13   <u>Notices</u>. Under this Agreement and/or any SOW, if one Party is required to give notice to the other, such notices shall be deemed given when personally delivered or three (3) business days after being mailed by U.S. certified mail, first class, postage prepaid (or by reputable courier service with package tracking ability (such as Fed Ex, UPS, DHL, etc.), and addressed as follows (or to such other address for notice as a Party may subsequently notify the other in accordance with the provisions of this Section):

If to Fiserv:      Fiserv Solutions, Inc.
                   4411 East Jones Bridge Road
                   Norcross, Georgia 30092
                   Electronic Payments – Marketing Department

                   With a copy (which does not constitute notice) to:
                   Fiserv, Inc.
                   255 Fiserv Drive
                   Brookfield, WI 53045
                   Attn: General Counsel

If to Consultant: Keystone Solutions, LLC
                   12460 Crabapple Road, Suite 202 #114
                   Alpharetta, Georgia 30004
                   Attn: Matthew Gellis, Managing Director

14.14   <u>Audit</u>.  Consultant will maintain Auditable Records with respect to the Services provided under this Agreement.  With respect to any given SOW, such records shall be maintained for a period of seven years from the date Services under such SOW are completed or seven years from the date of delivery of

the Deliverables (as applicable).  All Auditable Records that may assist in the audit process will be available for audit by Fiserv or its agents during normal business hours and upon reasonable advance notice.

14.15   Rules of Construction.  The article and section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. As used in this Agreement, unless otherwise provided to the contrary:

(a)      The article and section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(b)      Despite the possibility that one Party may have prepared the initial draft of this Agreement or played the greater role in the physical preparation of subsequent drafts, the Parties agree that neither of them shall be deemed the drafter of this Agreement and that, in construing this Agreement in case of any claim that any provision hereof may be ambiguous, no such provision shall be construed in favor of one Party on the ground that such provision was drafted by the other; and

(c)      The terms of this Agreement have been established by mutual negotiation and shall be deemed to have been mutually drafted.

14.16   Counterparts; Electronic Execution.  This Agreement and the SOWs hereunder may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  Facsimile or other electronic execution and delivery of this Agreement is legal, valid and binding execution and delivery for all purposes.

14.17   Section Headings.  The section headings used in this Agreement are for identification only, and have no impact on the meaning or intent of the section or paragraph.


**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement on the day and year first above written.


**FISERV SOLUTIONS, INC.**

Signature: _____

Name: _____

Title: Authorized Signatory

Date: _____


**CONSULTANT:**

Signature: _____

Name: Matthew Gellis

Title: CEO

Date: 01/13/2015

**EXHIBIT A**

**INSURANCE REQUIREMENTS**

During the Term of the Agreement, Consultant and its subcontractors shall secure and maintain, each at its own expense, insurance of the following types and amounts:

a.   Commercial General Liability ("**CGL**") Insurance in an amount of $1,000,000 per occurrence, with a $1,000,000 general aggregate covering, without limitation, bodily injury (including death), personal injury, defamation, property damage, contractual liability and products/completed operations coverage.   Fiserv, its Affiliates, and their respective successors, and each of their respective directors, officers, and employees shall be named as additional insureds on this policy either by a blanket endorsement, in which case, a copy is not required; or by separate endorsement if required by the insurance carrier, such separate endorsement to be provided to Fiserv.

b.   Workers compensation coverage at the statutorily required level for all Personnel in the states in which the Services are performed.

c.   Automobile Liability Insurance in an amount of $1,000,000 combined single limit covering bodily injury (including death) and property damage for all hired and non-owned vehicles used by Consultant and any Personnel.

d.   Umbrella Liability Insurance which shall provide excess, follow-form coverage with respect to the liability coverage required in subsections (a), (b), and (c) of this Exhibit A in an amount of $1,000,000 per occurrence and in the aggregate.

e.   Professional Liability or Technology Errors and Omissions Insurance to include cyber liability coverage with per claim limits of $1,000,000.

All of the foregoing policies shall be issued by insurance companies maintaining an A.M. Best Company rating of "A-VII" or better.   These insurance provisions set forth the minimum amounts and scopes of coverage to be maintained by Consultant and its subcontractors and are not to be construed in any way as a limitation of its liability under this Agreement.   If Consultant's subcontractors do not maintain the insurance required herein, Consultant shall endorse its policies to cover its subcontractor's activities under this Agreement.

All deductibles specified in the required insurance policies shall be assumed by and are for the account of Consultant or its subcontractor(s).   Where allowed by law or regulation, all insurance coverage shall be primary and will not participate with nor will be excess over any valid and collectable insurance or program of self-insurance carried by Fiserv.   Failure of Consultant or any subcontractor to maintain the required insurance shall constitute a material breach of this Agreement.

Prior to signing this Agreement, Consultant shall furnish Fiserv with its ACORD Certificate(s) of Insurance, and any separate endorsements required to name Fiserv, its Affiliates and their respective successors, and each of their respective directors, officers, and employees as additional insureds as specified in subsections (a) and (c) above, as evidence of all of the foregoing insurance coverage, and automatically thereafter concurrent with the renewal of each required policy.   Should Consultant receive notice of cancellation or a material reduction in any of the required policies, Consultant shall promptly provide Fiserv with no less than 30 days prior written notice of the same, unless such coverage is immediately replaced with similar coverage in scope and limits.   Consultant will also provide certificates of insurance for any approved subcontractors to Fiserv upon Fiserv's request.   Failure of Consultant or any subcontractor to provide any certificate(s) of insurance shall not absolve Consultant or any subcontractor of its responsibility to maintain the required insurance.

# EXHIBIT "B"

<u>**STATEMENT OF WORK #06**</u>

This Statement of Work (the "Statement of Work" or "SOW") is effectively dated as of December 15, 2016, by and between **Keystone Solutions, LLC**, a Nevada limited liablity company with offices at 12460 Crabapple Road, STE 202 #114, Alpharetta, GA 30004 ("Consultant" or "Keystone") and **Fiserv Solutions, LLC** (as converted from Fiserv Solutions, Inc.) ("Company" or "Fiserv"), and is subject to that certain Consulting Services Agreement ("Agreement") effectively dated as of January 13, 2015 by and between Consultant and Company.

**Proposal Background**

Keystone will provide Company with a framework for creating a Digital Center of Excellence and will supply expertise and staff to support the new strategy and direction of digital data at Fiserv. This project and the overall strategic direction will align with the Digital Analytics Strategy Plan maintained and collaboratively edited by Keystone and Company. This alignment will provide both strategic direction and guidance as well as tactical fulfillment and support of current and future analytics projects.

1.  **Summary**

    a.  Proposal Specifics:

        i.    Commencement:      Signature date

        ii.   Term:              Signature date – December 31, 2018

        iii.  Conclusion:        On or before December 31, 2018

2.  **Project Scope**

    The scope of this project primarily focuses on ePayments data and analytics needs while providing limited support for groups outside of ePayments. All projects will be limited by the current resource plan and resource capacity. This capacity is limited to 4.5 FTE resources from Keystone.. Burst capacity of up to 1.25 FTE resources may be added for project support. The primary tactical and fulfillment focus will be for projects outlined within the ePayments roadmap and analytics Strategic roadmap. Other projects or needs related to analytics will have an advisory support only if otherwise negotiated or funded. Keystone will provide the framework and initial support for the Digital Center of Excellence created to support the needs above. Note that capacity is reduced to 2.5 FTE's for basic project support in 2018.

    The Digital Center of Excellence ("DCoE") - As a dedicated center of excellence company can begin to promote enterprise-wide digital analytics collaboration, define best practices and standards, foster knowledge sharing, and support actionable decision making with consistent and credible data.
    - Initial activities may include:
        - ✓ Establish program metrics, KPIs, and mission
        - ✓ Establish training programs and educational solutions
        - ✓ Create appropriate measurement process and standards
        - ✓ Measurement framework
        - ✓ QA standards
        - ✓ Review processes

    ✓  Analytics intake process

**Initial 2017 Project Scope**

- Test & Target (T&T)
  - ✓ Pre-work
  - ✓ Governance / Documentation
  - ✓ Implementation (Solution Designs, Tech Specs, etc.)
  - ✓ Support and execution of development / coding
  - ✓ Post-production testing
  - ✓ Test launch framework
  - ✓ Tests start
- TMS (Tag Management Solution)
  - ✓ Pre-work
  - ✓ Implementation
  - ✓ Testing
  - ✓ Governance / Documentation
  - ✓ Migration of tags (Adobe Tags and T&T)
- Governance
  - ✓ Comprehensive ePayments governance model / documentation which will provide framework and application to other Fiserv business lines (Mobiliti, Biller Direct, etc.)
  - ✓ Begin centralization of documents / portal to kick off the FAQ, Data Dictionary, other support quick start guides
- Reporting Framework
  - ✓ Basic reporting, distributions, dashboards, ad-hoc Product reporting
  - ✓ Initial dashboard and report framework for T&T
- ePayments projects defined within the scope and project terms  may include Zelle, TransferNow, Popmoney, etc.
- Training / Education support- mix of materials, formal classes as well as informal gatherings (e.g. lunch & learns, etc.)
- Strategic support including but not limited to:
  - ○ Centralized team structure, scope, and responsibilities;
  - ○ Analytics roll-out across ePayments
  - ○ Test and target;
  - ○ Additional analytics tools required to support maturation of DCoE.
- Full QA process development, implementation, drive QA mapping with IT.
- Adobe contract negotiation support

**Initial 2018 Scope (Basic Support)**

- Expanded usage of Adobe Target
  - ○ Support of reporting, implementation, testing, etc.
  - ○ Potential strategy and implementation plan(s) expanding breadth of tests which may include partnering with FIs as resources allow.
- Additional product support as needed
  - ○ Popmoney
  - ○ TransferNow
  - ○ Zelle
- Expanded governance to addressing any gaps spanning intake to delivery data cycle
- Develop and roll-out Advanced 'Centralized Portal and Repository' with a focus on self-service
  - ○ Adoption
  - ○ Training
  - ○ Support Resources
- Training / Education program

3. **Project Approach**

The initial project schedule and timeline will be created at kickoff with Keystone and Company and modified from time-to-time as mutually agreed to and will not exceed the terms of this Statement of

Work without an executed Change Order.

4. **Project Resources**

The initial project team will include:  (project team makeup may shift depending on shifting project priorities)

- 1 - Senior Implementation Consultant
- 1 - Senior Analyst
- 1 Quality Assurance Consultants
- 1 - Project Manager
- .5 – Analytics Developer
- Additional burst capacity as required within terms of this SOW

5. **Quality Management Process**

Changes in scope, direction, support requirements, or priority will be communicated by Company to Keystone in writing or via a Change Order, pursuant to the procedures set forth in Section 2.2 (Changes in Scope of SOW) of the Agreement.  Impact to existing timelines and budget will be evaluated and communicated back to Company in writing with a request for authorization to proceed, if needed, in a written Change Order.

6. **Financial and Project Information**

a. This Statement of Work is based on a Fixed Fee staff augmentation model.   All projects and estimates are based on information available and provided and those estimates may change depending on additional requests, alteration of the scope, new or unforeseen complexities, new priorities or requests communicated in writing by Company; provided, however, that Keystone will not exceed the hours estimated unless (a) there is a change in scope of the assignment that materially impacts the number of hours of work required; and (b) the parties agree on such change in scope, schedule and pricing in writing via a Change Order.

b. This effort assumes a 9am to 5pm schedule. Standard 5-day business week calendar from the periods of 9am to 5pm Eastern Time, Monday through Friday, up to a maximum of 40 hours per week per FTE. Schedules may shift to support local offices as needed for projects or based on resource locations. This schedule assumes standard holidays, PTO, and sick time.

c. This discounted fixed fee rate is contingent upon payment as outlined in the payment terms below.

d. For all instances where authorization is required in writing (such as hours consumed, new hours required, impact statements to current project timelines, travel expenses, or other approval scenarios as outlined in this document) email is and will be considered "in writing" both from a notification and response perspective and will specifically call out required approval and actions as necessary.

e. Travel Expenses - Travel is not included in this SOW and all reasonable and pre-approved travel expenses must be invoiced in accordance with Section 3.6 of the Agreement.

f.   Media and Public Relations – this discounted fixed fee rate is contingent upon the following participation of Company with Keystone, subject to Section 6.1 of the Agreement:

    a.   Ability to use Fiserv logo, in accordance with Fiserv branding guidelines,  in standard Keystone collateral which may include sales presentations, internal meetings, external website, and other marketing material.  General logo use is limited to indication of Fiserv as a client of Keystone for the purposes of digital measurement strategy and execution.   For all other  presentations, education, or collateral the use of Fiserv logo will be as agreed in writing by Fiserv, and in accordance with Fiserv branding guidelines.

    b.   Testimonial from Sr. Leadership at project kickoff and end of engagement, and key milestones as mutually agreed on throughout the term of the SOW and with  prior approval and consent from Fiserv.

    c.   Reference calls with Keystone prospects with prior notice and scheduling availability, as mutually agreed on in advance.

    d.   Four (4) joint case studies/white papers on key value propositions for both Keystone and Fiserv over the term of engagement.

**Payment Terms are as follows:**

g.   Company will be invoiced $650,000.00 upon contract execution. The discounted rate of this project is contingent upon the initial payment being processed and received prior to January 15, 2017. Company will have no direct costs related to this SOW and project work in 2017 unless via an approved Change Order signed by both parties. Incidentals not provided for in this SOW shall be billed in accordance with Section 3.6 of the Agreement.  Starting in January, 2018, Company will be invoiced monthly in the amount of $41,663.83. Payment is due in accordance with Section 3.3 of the Agreement. Total spend for 2018 will be $499,966. Per Section 7.5 of the Agreement, in the event Fiserv terminates this SOW for any reason, Keystone shall reimburse Fiserv for all unearned fees which were prepaid by Fiserv.

| Item | Duration | Cost |
| --- | --- | --- |
| 2017 Digital Center of Excellence (ePayments focus) | 2017 | $650,000 |
| 2018 Digital Center of Excellence (limited support) | 2018 | $499,966 |

IN WITNESS WHEREOF, the parties have caused this Statement of Work to be executed by their duly

authorized representatives.

Keystone Solutions, LLC

By: _____

Print Name: Matthew Gellis

Title: CEO

Date: 1/13/2017

Fiserv Solutions, LLC

By: _____

Print Name: Matthew Wilcox

Title: Authorized Signatory VP

Date: 1/13/17

# EXHIBIT "C"

## STATEMENT OF WORK #07

This Statement of Work (the "Statement of Work" or "SOW") is effectively dated as of January 11, 2018, by and between **Keystone Solutions, LLC**, a Nevada limited liability company with offices at 12460 Crabapple Road, STE 202 #114, Alpharetta, GA 30004 ("Consultant" or "Keystone") and **Fiserv Solutions, LLC** (as converted from Fiserv Solutions, Inc.) ("Company" or "Fiserv"), and is subject to that certain Consulting Services Agreement ("Agreement") effectively dated as of January 13, 2015 by and between Consultant and Company.

**Proposal Background**

Keystone will provide Company with best-in-class training and support in training in-house staff to create subject matter experts in the area of Digital Analytics. This SOW will focus on the curriculum, training, and additional projects required to train two (2) roles internally at Fiserv as well as to create and refine all required documentation, governance, process, or other supporting infrastructure related to the training and management of the Analytics organization.

1. **Summary**

    a.  Proposal Specifics:

         i.  Commencement:        Signature date

         ii.  Term:               Signature date – December 31, 2018

         iii.  Conclusion:        On or before December 31, 2018

2. **Project Scope**

    The Project Scope reflected in this SOW represents a change to the 2018 Project Scope which was outlined and agreed upon in Statement of Work #6 dated December 15, 2016. The project scope for this SOW is limited to training, documentation, governance, process, and curriculum development as this SOW pertains to the creation of internal Subject Matter Experts (SME's) in the role(s) of Technical Development and Technical Analysis within the Analytics organization. Any issues identified and associated with 2017 analytics work will be reviewed and resolved through appropriate remediation steps as part of the services under this SOW and the review and resolution will used for training but training curriculum will not be developed with an intent to address any issues which are tied to 2017 releases. All projects will be limited by the current resource plan and resource capacity. The scope of this SOW does not include specific or named project completion or fulfillment as it relates to measurement projects or goals currently outlined for releases in calendar year 2018. Any project work done to existing or upcoming projects that are not part of the created curriculum will need to follow the training outline or schedule, and will be required to be approved by the analytics team, and will be precluded from being worked on otherwise. Each training module will be delivered in 2018 covering up to 5 named participants.

    **2018 Training Modules**

    - **Module One**

- ✓ Organizational governance / integration, strategy, process
- ✓ DCoE governance / strategy / process / roles
- ✓ Roles / RACI / PM Strategy
- ✓ Review needed documentation for SharePoint, some will be completed as part of projects with remaining identified for team completion post-training

- **Module Two**
  - ✓ Data intake process
  - ✓ Discovery process
  - ✓ Intake automation
  - ✓ Setting up success – parameters, expectations, and asking why
  - ✓ Data strategy and vision | 2019 | Value proposition of data
- **Module Three**
  - ✓ Data collection fundamentals
  - ✓ Vendor agnostic best practices
  - ✓ Basic configurations / metrics / customizations
- **Module Four**
  - ✓ Tag Management development and implementation
  - ✓ Data Layer management and implementation
  - ✓ Adobe Analytics development and implementation
  - ✓ Managing the data technology stack
- **Module Five**
  - ✓ Deeper analysis
  - ✓ Optimization through data
  - ✓ Target
- **Module Six**
  - ✓ Analytics QA
  - ✓ Data credibility management

**Additional Deliverables / Value**

- **Curriculum**
  - ✓ Fully developed curriculum for repeatable, consistent training internally
  - ✓ All exercises, content, material, etc.
- **Resources**
  - ✓ SME's trained internally for the Implementation Development and Technical Analyst roles.
- **Process Automation**
  - ✓ Integrated documentation, process, governance for all touch points of the Analytics team

3. **Project Approach**

The initial project schedule and timeline will be created at kickoff with Keystone and Company and modified from time-to-time as mutually agreed to and will not exceed the terms of this Statement of Work without an executed Change Order.

4. **Project Resources**

The project team reflected in this SOW represents a change from the project team that was outlined and agreed upon in Statement of Work #6 dated December 15, 2016. The initial project team will be available at various times depending on the modules / training requirements for the project schedule and resources mapped to those modules. These will include:

- Sr. Engagement Lead (Matt Gellis) for 2018
- Sr. Implementation Engineer
- Sr. Quality Assurance Engineer
- Sr. Analytics Project Manager

- Sr. Analytics Developer

5.  **Quality Management Process**

   Changes in scope, direction, support requirements, or priority will be communicated by Company to
   Keystone in writing or via a Change Order, pursuant to the procedures set forth in Section 2.2
   (Changes in Scope of SOW) of the Agreement. Impact to existing timelines and budget will be
   evaluated and communicated back to Company in writing with a request for authorization to proceed,
   if needed, in a written Change Order.

6.  **Financial and Project Information**

   a.  This Statement of Work is based on a Fixed Fee training augmentation model.  All projects
       and estimates are based on information available and provided and those estimates may
       change depending on additional requests, alteration of the scope, new or unforeseen
       complexities, new priorities or requests communicated in writing by Company; provided,
       however, that Keystone will not exceed the hours estimated unless (a) there is a change in
       scope of the assignment that materially impacts the number of hours of work required; and
       (b) the parties agree on such change in scope, schedule, and pricing in writing via a Change
       Order.

   b.  This effort assumes a 9am to 5pm schedule. Standard 5-day business week calendar from the
       periods of 9am to 5pm Eastern Time, Monday through Friday, up to a maximum of 40 hours
       per week per FTE. Schedules may shift to support local offices as needed for projects or
       based on resource locations. This schedule assumes standard holidays, PTO, and sick time.

   c.  This discounted fixed fee rate is contingent upon payment as outlined in the payment terms
       below.

   d.  For all instances where authorization is required in writing (such as hours consumed, new
       hours required, impact statements to current project timelines, travel expenses, or other
       approval scenarios as outlined in this document) email is and will be considered "in writing"
       both from a notification and response perspective and will specifically call out required
       approval and actions as necessary.

   e.  Travel Expenses - Travel is not included in this SOW and all reasonable and pre-approved
       travel expenses must be invoiced in accordance with Section 3.6 of the Agreement.

   f.  Media and Public Relations – this discounted fixed fee rate is contingent upon the following
       participation of Company with Keystone subject to Section 6.1 of the Agreement:

       a.  Ability to use Fiserv logo, in accordance with Fiserv branding guidelines, in
           standard Keystone collateral which may include sales presentations, internal
           meetings, external website, and other marketing material.  General logo use is
           limited to indication of Fiserv as a client of Keystone for the purposes of digital
           measurement strategy and execution.   For all other presentations, education, or
           collateral the use of Fiserv logo will be as agreed in writing by Fiserv, and in
           accordance with Fiserv branding guidelines.

b. Testimonial from Sr. Leadership at project kickoff and end of engagement, and key milestones as mutually agreed on throughout the term of the SOW and with prior approval and consent from Fiserv.

c. Reference calls with Keystone prospects with prior notice and scheduling availability, as mutually agreed on in advance.

d. Four (4) joint case studies/white papers on key value propositions for both Keystone and Fiserv over the term of engagement.

**Payment Terms are as follows:**

g. Starting in January, 2018, Company will be invoiced monthly in the amount of $41,663.83. Payment is due in accordance with Section 3.3 of the Agreement. Total spend for 2018 will be $499,966. Incidentals not provided for in this SOW shall be billed in accordance with Section 3.6 of the Agreement. Per Section 7.5 of the Agreement, in the event Fiserv terminates this SOW for any reason, Keystone shall reimburse Fiserv for all unearned fees which were prepaid by Fiserv.

| Item | Duration | Cost |
|------|----------|------|
| 2018 Sr. Training Program 2018 Governance Program | 2018 | $499,966 |

IN WITNESS WHEREOF, the parties have caused this Statement of Work to be executed by their duly authorized representatives.

**Keystone Solutions, LLC**

By: _____

Print Name: Matthew Gellis

Title: CEO

Date: 1/11/18

**Fiserv Solutions, LLC**

By: _____

Print Name: Megan Dannier

Title: Authorized Signatory

Date: 1/11/18

# EXHIBIT "D"

**STATEMENT OF WORK #08**

This Statement of Work (the "Statement of Work" or "SOW") is effectively dated as of October 1, 2018, by and between **Keystone Solutions, LLC**, a Nevada limited liablity company with offices at 12460 Crabapple Road, STE 202 #114, Alpharetta, GA 30004 ("Consultant" or "Keystone") and **Fiserv Solutions, LLC** (as converted from Fiserv Solutions, Inc.) ("Company" or "Fiserv"), and is subject to that certain Consulting Services Agreement ("Agreement") effectively dated as of January 13, 2015, by and between Consultant and Company.

**Project Background**
Keystone will provide Company with best-in-class support related to deployment of digital analytics for Company's upcoming Challenger product release. This SOW will focus on the requirements gathering, solution design, implementation and technical specifications, and quality assurance needed for analytics and tag management deployment. It is anticipated this activity, with related transition support, will cover 19.2 and 19.3 releases.

1. **Summary**
    a. Project Specifics:
        i.   Commencement:      Signature date
        ii.  Term:              Signature date – June 30, 2019
        iii. Conclusion:        On or before June 30, 2019

2. **Project Scope**
The project scope for this SOW is limited to the initial launch of the Challenger platform including release requirements and discovery, solution design, technical implementation specifications, and testing of implemented solutions. The above scope applies to any required analytics platforms needed to satisfy these initial requirements, including the analytics, tag management, and optimization solutions currently in use at Fiserv. The anticipated schedule of features deployed or implemented is included below, by release. This schedule may change, as agreed on, or due to changes made in priority by Fiserv and the updated deployment schedule for the releases will supercede these as updates are made.

**Analytics Included By Release**

- **Release 19.2 (~Sprints 68 – 73 + QA Hardening Sprints 74 & 75)**
    ✓ Tag management implementation
    ✓ Data layer integration / mapping
    ✓ Critical path and MVP analytics for Challenger

- **Release 19.3 (~Sprints 74 – 79 + QA Hardening Sprints 80 & 81)**
    ✓ Additional Challenger tagging and refinement including:
        ▪ Any continuation of deployment from 19.2 due to Delivery capacity in 19.2
        ▪ Additional errors, flows, events for Challenger
        ▪ Adobe Target, if required

- **Additional Support**
    ✓ Mapping of current training exercises and support to align with Challenger web analytics deployment and apply completed training to Zelle web analytics deployment.
    ✓ Knowledge transfer and transition support period post 19.3 release through 6/30/2019.

3. **Project Approach**
The initial project schedule and timeline will be created at kickoff with Keystone and Company and modified from time-to-time as mutually agreed to and will not exceed the terms of this Statement of Work without an executed Change Order.

4. **Project Resources**
The project team will be available and/or engaged at various times depending on the portion of the deployment or analytics cycle a project is on, but may include:
- Executive Lead / Sponsor (Matthew Gellis)
- Project Manager / Engagement Lead
- Sr. Analyst / Data Visualization Lead
- Sr. Implementation Lead
- Sr. Quality Assurance Engineer
- Sr. Analytics Developer

5. **Quality Management Process**

Changes in scope, direction, support requirements, or priority will be communicated by Company to Keystone in writing or via a Change Order, pursuant to the procedures set forth in Section 2.2 (Changes in Scope of SOW) of the Agreement. Impact to existing timelines and budget will be evaluated and communicated back to Company in writing with a request for authorization to proceed, if needed, in a written Change Order.

6. **Financial and Project Information**

   a. This Statement of Work is based on a Fixed Fee support augmentation model. All projects and estimates are based on information available and provided and those estimates may change depending on additional requests, alteration of the scope, new or unforeseen complexities, new priorities or requests communicated in writing by Company; provided, however, that Keystone will not exceed the hours estimated unless (a) there is a change in scope of the assignment that materially impacts the number of hours of work required; and (b) the parties agree on such change in scope, schedule, and pricing in writing via a Change Order.

   b. This effort assumes a 9am to 5pm Eastern Time schedule. Standard 5-day business week calendar from the periods of 9am to 5pm Eastern Time, Monday through Friday, up to a maximum of 40 hours per week per FTE. Schedules may shift to support local offices as needed for projects or based on resource locations. This schedule assumes standard holidays, PTO, and sick time.

   c. This discounted fixed fee rate is contingent upon payment as outlined in the payment terms below.

   d. For all instances where authorization is required in writing (such as hours consumed, new hours required, impact statements to current project timelines, travel expenses, or other approval scenarios as outlined in this document) email is and will be considered "in writing" both from a notification and response perspective and will specifically call out required approval and actions as necessary.

   e. Travel Expenses – Travel is not included in this SOW and all reasonable and pre-approved travel expenses must be invoiced in accordance with Section 3.6 of the Agreement.

   f. Media and Public Relations – This discounted fixed fee rate is contingent upon the following participation of Company with Keystone subject to Section 6.1 of the Agreement:

      a. Ability to use Fiserv logo, in accordance with Fiserv branding guidelines, in standard Keystone collateral which may include sales presentations, internal meetings, external website, and other marketing material. General logo use is limited to indication of Fiserv as a client of Keystone for the purposes of digital measurement strategy and execution. For all other presentations, education, or collateral the use of Fiserv logo will be as agreed in writing by Fiserv, and in accordance with Fiserv branding guidelines.

      b. Testimonial from Sr. Leadership at project kickoff and end of engagement, and key milestones as mutually agreed on throughout the term of the SOW and with prior approval and consent from Fiserv.

      c. Reference calls with Keystone prospects with prior notice and scheduling availability, as mutually agreed on in advance.

      d. Four (4) joint case studies/white papers on key value propositions for both Keystone and Fiserv over the term of engagement.

   **Payment Terms are as follows:**

   g. The fee covering the term of this SOW (Releases 19.2 – 19.3 or through 6/30/2019) shall be paid according to the following schedule: On January 1, 2019 Fiserv will be billed in the amount of $177,780. Fiserv will then be invoiced $44,444 on the first of each month, starting February 1, 2019 with the final payment invoiced on 6/1/2019 for a total of 5 (five) additional payments. Payment is due in accordance with Section 3.3 of the Agreement. Total spend related to this SOW for 2018 will be $0. Total spend related to this SOW for 2019 will be $400,000. Incidentals not provided for in this SOW shall be billed in accordance with Section 3.6 of the Agreement. Per Section 7.5 of the Agreement, in the event Fiserv terminates this SOW for any reason, Keystone shall reimburse Fiserv for all unearned fees which were prepaid by Fiserv.

| Item | Duration | Cost |
|---|---|---|
| Analytics Challenger Release Support | Oct 2018 – June 2019 | $400,000 |

IN WITNESS WHEREOF, the parties have caused this Statement of Work to be executed by their duly authorized representatives.

| Keystone Solutions, LLC | Fiserv Solutions, LLC |
|---|---|
| By: *Matt Gellis* | By: *Megan Pannier* |
| A4046AB04D3947F... | 0673A069307645C... |
| Print Name: Matt Gellis | Print Name: Megan Pannier |
| Title: CEO | Title: Authorized Signatory |
| Date: October 9, 2018 \| 10:23 CDT | Date: October 9, 2018 \| 10:40 CDT |

# EXHIBIT "E"

**STATEMENT OF WORK #09**

This Statement of Work (the "Statement of Work" or "SOW") is effectively dated as of October 1, 2018, by and between **Keystone Solutions, LLC**, a Nevada limited liablity company with offices at 12460 Crabapple Road, STE 202 #114, Alpharetta, GA 30004 ("Consultant" or "Keystone") and **Fiserv Solutions, LLC** (as converted from Fiserv Solutions, Inc.) ("Company" or "Fiserv"), and is subject to that certain Consulting Services Agreement ("Agreement") effectively dated as of January 13, 2015, by and between Consultant and Company.

**Project Background**
Keystone will provide Company with best-in-class support related to creation of emerging Digital Analytics Council, creation of appropriate analytics governance and best practices, support of the existing Analytics Team (under John Wilkes) initiatives, and other analytics projects as time and scope allow.

1. **Summary**
   a.  Project Specifics:
       i.    Commencement:       Signature date
       ii.   Term:               Signature date – June 30, 2019
       iii.  Conclusion:         On or before June 30, 2019

2. **Project Scope**
   The project scope for this SOW is limited to support of the creation of Fiserv global analytics standards, appropriate governance iniaitives, team training and support, and other insight or analysis work as agreed on. This may include new flow work and assistance if time and priority allow but would be in a support role only.  The anticipated schedule of features deployed or implemented will vary over the term of the SOW.  The schedule may change, as agreed on, or due to changes made in priority by Fiserv and the updated deployment schedule for the releases will supercede these as updates are made.

   - **Types of Support**
     ✓  QA and data integrity assistance
     ✓  QA lab and automation projects
     ✓  Global analytics governance and models
     ✓  Current implementations and deployments
     ✓  Additional support to existing team

3. **Project Approach**
   The initial project schedule and timeline will be created at kickoff with Keystone and Company and modified from time-to-time as mutually agreed to and will not exceed the terms of this Statement of Work without an executed Change Order.

4. **Project Resources**
   The project team will vary depending on the portion of the deployment or analytics cycle a project is on, but it is anticipated that the heavier focus will be on governance and global support for the term of this SOW:
   - Executive Lead / Sponsor (Matthew Gellis)
   - Analytics Strategist / Lead
   - (Analyst, Development, Implementation, or QA resources as requested/needed based on upcoming priorities)

5. **Quality Management Process**
   Changes in scope, direction, support requirements, or priority will be communicated by Company to Keystone in writing or via a Change Order, pursuant to the procedures set forth in Section 2.2 (Changes in Scope of SOW) of the Agreement. Impact to existing timelines and budget will be evaluated and communicated back to Company in writing with a request for authorization to proceed, if needed, in a written Change Order.

6. **Financial and Project Information**
   a.  This Statement of Work is based on a Fixed Fee support augmentation model.  All projects and estimates are based on information available and provided and those estimates may change depending on additional requests, alteration of the scope, new or unforeseen complexities, new priorities or requests communicated in writing by Company; provided, however, that Keystone will not exceed the hours estimated unless (a) there is a change in scope of the assignment that materially impacts the number of hours of work required; and (b) the parties agree on such change in scope, schedule, and pricing in writing via a Change Order.
   b.  This effort assumes a 9am to 5pm Eastern Time schedule.  Standard 5-day business week calendar from the periods of 9am to 5pm Eastern Time, Monday through Friday, up to a maximum of 25 hours per week.  Schedules may shift to support local offices as needed for projects or based on resource locations.  This schedule assumes standard holidays, PTO, and sick time.

c. This discounted fixed fee rate is contingent upon payment as outlined in the payment terms below.
d. For all instances where authorization is required in writing (such as hours consumed, new hours required, impact statements to current project timelines, travel expenses, or other approval scenarios as outlined in this document) email is and will be considered "in writing" both from a notification and response perspective and will specifically call out required approval and actions as necessary.
e. Travel Expenses – Travel is not included in this SOW and all reasonable and pre-approved travel expenses must be invoiced in accordance with Section 3.6 of the Agreement.
f. Media and Public Relations – This discounted fixed fee rate is contingent upon the following participation of Company with Keystone subject to Section 6.1 of the Agreement:
   a. Ability to use Fiserv logo, in accordance with Fiserv branding guidelines, in standard Keystone collateral which may include sales presentations, internal meetings, external website, and other marketing material. General logo use is limited to indication of Fiserv as a client of Keystone for the purposes of digital measurement strategy and execution. For all other presentations, education, or collateral the use of Fiserv logo will be as agreed in writing by Fiserv, and in accordance with Fiserv branding guidelines.
   b. Testimonial from Sr. Leadership at project kickoff and end of engagement, and key milestones as mutually agreed on throughout the term of the SOW and with prior approval and consent from Fiserv.
   c. Reference calls with Keystone prospects with prior notice and scheduling availability, as mutually agreed on in advance.
   d. Four (4) joint case studies/white papers on key value propositions for both Keystone and Fiserv over the term of engagement.

**Payment Terms are as follows:**

g. The fee covering the term of this SOW shall be paid according to the following schedule: On January 1, 2019 Fiserv will be billed in the amount of $55,560. Fiserv will then be invoiced $13,888 on the first of each month, starting February 1, 2019 with the final payment invoiced on 6/1/2019 for a total of 5 (five) additional payments. Payment is due in accordance with Section 3.3 of the Agreement. Total spend related to this SOW for 2018 will be $0. Total spend related to this SOW for 2019 will be $125,000. Incidentals not provided for in this SOW shall be billed in accordance with Section 3.6 of the Agreement. Per Section 7.5 of the Agreement, in the event Fiserv terminates this SOW for any reason, Keystone shall reimburse Fiserv for all unearned fees which were prepaid by Fiserv.

| Item | Duration | Cost |
| --- | --- | --- |
| Global Analytics Governance & Support | Oct 2018 – June 2019 | $125,000 |

IN WITNESS WHEREOF, the parties have caused this Statement of Work to be executed by their duly authorized representatives.

**Keystone Solutions, LLC**

By: _Matt Gellis_
    A4046AB01D3947F...

Print Name: Matt Gellis

Title: CEO

Date: October 9, 2018 | 10:23 CDT

**Fiserv Solutions, LLC**

By: _Megan Pannier_
    0673A060307645C...

Print Name: Megan Pannier

Title: Authorized Signatory

Date: October 9, 2018 | 10:40 CDT

# EXHIBIT "F"

## STATEMENT OF WORK #10

This Statement of Work (the "Statement of Work" or "SOW") is effectively dated as of July 1, 2019, by and between **Keystone Solutions, LLC**, a Nevada limited liablity company with offices at 12460 Crabapple Road, STE 202 #114, Alpharetta, GA 30004 ("Consultant" or "Keystone") and **Fiserv Solutions, LLC** (as converted from Fiserv Solutions, Inc.) ("Company" or "Fiserv"), and is subject to that certain Consulting Services Agreement ("Agreement") effectively dated as of January 13, 2015, by and between Consultant and Company.

**Project Background**
Keystone will provide Company with best-in-class support related to their prioritized deployment of digital analytics for Company's upcoming 20.1 product release. This SOW will focus on assistance with requirements gathering, solution design, implementation and technical specifications, and quality assurance needed for analytics and tag management deployment. It is anticipated this activity will cover 19.4 and 20.1 releases.

1. **Summary**
   a. Project Specifics:
      i.   Commencement:    July 1, 2019
      ii.  Term:    July 1, 2019 – December 31, 2019
      iii. Conclusion:    On or before December 31, 2019

2. **Project Scope**
   The project scope for this SOW is limited to work performed during Q3 and Q4, 2019 including the 20.1 product release requirements and discovery, solution design, technical implementation specifications, and testing of implemented solutions. The above scope applies to any required analytics platforms needed to satisfy these initial requirements, including the analytics, tag management, and optimization solutions currently in use at Fiserv. The anticipated schedule of features deployed or implemented is dependent on final product validation. This schedule may change, as agreed on, or due to changes made in priority by Fiserv and the updated deployment schedule for the releases will supercede these as updates are made.

   **Analytics Included By Release**

   - **Release 20.1**
     - ✓ 0.75 FTE – Data Governance / Automation
     - ✓ 0.25 FTE – Quality Assurance / Testing
     - ✓ 0.5 FTE – Analyst
     - ✓ 0.5 FTE - Strategy

3. **Project Approach**
   The initial project schedule and timeline will be created at kickoff with Keystone and Company and modified from time-to-time as mutually agreed to and will not exceed the terms of this Statement of Work without an executed Change Order.

4. **Project Resources**
   The project team will be available and/or engaged at various times depending on the portion of the deployment or analytics cycle a project is on, but may include:
   - Executive Lead / Strategy (Matthew Gellis)
   - Sr. Analyst
   - Sr. Quality Assurance Engineer

5. **Quality Management Process**
   Changes in scope, direction, support requirements, or priority will be communicated by Company to Keystone in writing or via a Change Order, pursuant to the procedures set forth in Section 2.2 (Changes in Scope of SOW) of the Agreement. Impact to existing timelines and budget will be evaluated and communicated back to Company in writing with a request for authorization to proceed, if needed, in a written Change Order.

6. **Financial and Project Information**
   a. This Statement of Work is based on a Fixed Fee support augmentation model. All projects and estimates are based on information available and provided and those estimates may change depending on additional requests, alteration of the scope, new or unforeseen complexities, new priorities or requests communicated in writing by Company; provided, however, that Keystone will not exceed the hours estimated unless (a) there is a change in scope of the assignment that materially impacts the number of hours of work required; and (b) the parties agree on such change in scope, schedule, and pricing in writing via a Change Order.
   b. This effort assumes a 9am to 5pm Eastern Time schedule. Standard 5-day business week calendar from the periods of 9am to 5pm Eastern Time, Monday through Friday, with a project hour cap of 880 hours for the term. Schedules

may shift to support local offices as needed for projects or based on resource locations. This schedule assumes standard holidays, PTO, and sick time.

c. This discounted fixed fee rate is contingent upon payment as outlined in the payment terms below.

d. For all instances where authorization is required in writing (such as hours consumed, new hours required, impact statements to current project timelines, travel expenses, or other approval scenarios as outlined in this document) email is and will be considered "in writing" both from a notification and response perspective and will specifically call out required approval and actions as necessary.

e. Travel Expenses – Travel is not included in this SOW and all reasonable and pre-approved travel expenses must be invoiced in accordance with Section 3.6 of the Agreement.

f. Media and Public Relations – This discounted fixed fee rate is contingent upon the following participation of Company with Keystone subject to Section 6.1 of the Agreement:

  a. Ability to use Fiserv logo, in accordance with Fiserv branding guidelines, in standard Keystone collateral which may include sales presentations, internal meetings, external website, and other marketing material. General logo use is limited to indication of Fiserv as a client of Keystone for the purposes of digital measurement strategy and execution. For all other presentations, education, or collateral the use of Fiserv logo will be as agreed in writing by Fiserv, and in accordance with Fiserv branding guidelines.

  b. Testimonial from Sr. Leadership at project kickoff and end of engagement, and key milestones as mutually agreed on throughout the term of the SOW and with prior approval and consent from Fiserv.

  c. Reference calls with Keystone prospects with prior notice and scheduling availability, as mutually agreed on in advance.

  d. Four (4) joint case studies/white papers on key value propositions for both Keystone and Fiserv over the term of engagement.

**Payment Terms are as follows:**

g. The fee covering the term of this SOW shall be paid according to the following schedule: Upon execution of this SOW, Fiserv will be invoiced in the amount of $80,000. Fiserv will then be invoiced $45,000 on January 1, 2020. Payment is due in accordance with Section 3.3 of the Agreement. Total spend related to this SOW for 2019 will be $80,000. Total spend related to this SOW for 2020 will be $45,000. Incidentals not provided for in this SOW shall be billed in accordance with Section 3.6 of the Agreement. Per Section 7.5 of the Agreement, in the event Fiserv terminates this SOW for any reason, Keystone shall reimburse Fiserv for all unearned fees which were prepaid by Fiserv.

| Item | Duration | Cost |
| --- | --- | --- |
| Release 19.4 – 20.1 Support | July 1 – Dec 31 2019 | $125,000 |

IN WITNESS WHEREOF, the parties have caused this Statement of Work to be executed by their duly authorized representatives.

**Keystone Solutions, LLC**

By: _Matt Gellis_

730A64FA37664B2...

Print Name: Matt Gellis

Title: CEO

Date: September 15, 2019 | 21:03 CDT

**Fiserv Solutions, LLC**

DocuSigned by:

By: _Megan Pannier_

0673A96930784CC...

Print Name: Megan Pannier

Title: Authorized Signatory

Date: September 16, 2019 | 07:44 CDT

# EXHIBIT "G"

## STATEMENT OF WORK #11

This Statement of Work (the "Statement of Work" or "SOW") is effectively dated as of February 1, 2020, by and between **Keystone Solutions, LLC**, a Nevada limited liablity company with offices at 12460 Crabapple Road, STE 202 #114, Alpharetta, GA 30004 ("Consultant" or "Keystone") and **Fiserv Solutions, LLC** (as converted from Fiserv Solutions, Inc.) ("Company" or "Fiserv"), and is subject to that certain Consulting Services Agreement ("Agreement") effectively dated as of January 13, 2015, by and between Consultant and Company.

**Project Background**
Keystone will provide Company with best-in-class support related to creation of a new implementation methodology and deployment framework outlining all objects, code, connectivity, and other elements necessary to deploy analytics within Fiserv. This SOW will focus on creation, delivery, and transition of that framework to Fiserv. All other requests will be out of scope for this SOW.

1. **Summary**
   a. Project Specifics:
      i. Commencement: February 1, 2020
      ii. Term: February 1, 2020 – June 30, 2020
      iii. Conclusion: On or before June 30, 2019

2. **Project Scope**
   The project scope for this SOW is limited to work performed during Q1 and Q2, 2020. The above scope applies only to ePayments requirements for analytics. This schedule may change, as agreed on, or due to changes made in priority by Fiserv and communicated to Keystone.

   **Analytics Included By Release**

   - **Q1 2020 – Q2 2020**
     ✓ 1.25 FTE – Sr. Implementation Engineer

3. **Project Approach**
   The initial project schedule and timeline will be created at kickoff with Keystone and Company and modified from time-to-time as mutually agreed to and will not exceed the terms of this Statement of Work without an executed Change Order.

4. **Project Resources**
   The project team will be available and/or engaged at various times depending on the portion of the deployment or analytics cycle a project is on, but may include:
   - Sr. Implementation Engineer

5. **Quality Management Process**
   Changes in scope, direction, support requirements, or priority will be communicated by Company to Keystone in writing or via a Change Order, pursuant to the procedures set forth in Section 2.2 (Changes in Scope of SOW) of the Agreement. Impact to existing timelines and budget will be evaluated and communicated back to Company in writing with a request for authorization to proceed, if needed, in a written Change Order.

6. **Financial and Project Information**
   a. This Statement of Work is based on a Fixed Fee support augmentation model. All projects and estimates are based on information available and provided and those estimates may change depending on additional requests, alteration of the scope, new or unforeseen complexities, new priorities or requests communicated in writing by Company; provided, however, that Keystone will not exceed the hours estimated unless (a) there is a change in scope of the assignment that materially impacts the number of hours of work required; and (b) the parties agree on such change in scope, schedule, and pricing in writing via a Change Order.
   b. This effort assumes a 9am to 5pm Eastern Time schedule. Standard 5-day business week calendar from the periods of 9am to 5pm Eastern Time, Monday through Friday, with a project hour cap of 1100 hours for the term. Schedules may shift to support local offices as needed for projects or based on resource locations. This schedule assumes standard holidays, PTO, and sick time.
   c. This discounted fixed fee rate is contingent upon payment as outlined in the payment terms below.
   d. For all instances where authorization is required in writing (such as hours consumed, new hours required, impact statements to current project timelines, travel expenses, or other approval scenarios as outlined in this document) email is and will be considered "in writing" both from a notification and response perspective and will specifically call out required approval and actions as necessary.
   e. Travel Expenses – Travel is not included in this SOW and all reasonable and pre-approved travel expenses must be invoiced in accordance with Section 3.6 of the Agreement.

f.  Media and Public Relations – This discounted fixed fee rate is contingent upon the following participation of Company with Keystone subject to Section 6.1 of the Agreement:

a.  Ability to use Fiserv logo, in accordance with Fiserv branding guidelines, in standard Keystone collateral which may include sales presentations, internal meetings, external website, and other marketing material.  General logo use is limited to indication of Fiserv as a client of Keystone for the purposes of digital measurement strategy and execution.  For all other presentations, education, or collateral the use of Fiserv logo will be as agreed in writing by Fiserv, and in accordance with Fiserv branding guidelines.

b.  Testimonial from Sr. Leadership at project kickoff and end of engagement, and key milestones as mutually agreed on throughout the term of the SOW and with prior approval and consent from Fiserv.

c.  Reference calls with Keystone prospects with prior notice and scheduling availability, as mutually agreed on in advance.

d.  Four (4) joint case studies/white papers on key value propositions for both Keystone and Fiserv over the term of engagement.

**Payment Terms are as follows:**

g.  The fee covering the term of this SOW  shall be paid according to the following schedule:  Upon execution of this SOW,  Fiserv will be invoiced in the amount of  $68,200.  Fiserv will then be invoiced $34,100 on the first of each month beginning April 1, 2020 and a final invoice sent June 1, 2020.  Payment is due in accordance with Section 3.3 of the Agreement.  Incidentals not provided for in this SOW shall be billed in accordance with Section 3.6 of the Agreement.  Per Section 7.5 of the Agreement, in the event Fiserv terminates this SOW for any reason, Keystone shall reimburse Fiserv for all unearned fees which were prepaid by Fiserv.

| Item | Duration | Cost |
|---|---|---|
| Implementation Framework | Feb 1, 20 – June 30, 20 | $170,500 |

IN WITNESS WHEREOF, the parties have caused this Statement of Work to be executed by their duly authorized representatives.

**Keystone Solutions, LLC**

By: _Matt Gellis_
730A64FA37664B2...

Print Name: Matt Gellis

Title: CEO

Date: March 26, 2020 | 11:00 PDT

**Fiserv Solutions, LLC**

By: _Megan Pannier_
0673A969397645C...

Print Name: Megan Pannier

Title: Authorized Signatory

Date: March 26, 2020 | 16:53 CDT

# EXHIBIT "H"

## STATEMENT OF WORK #12

This Statement of Work (the "Statement of Work" or "SOW") is effectively dated as of February 1, 2020, by and between **Keystone Solutions, LLC**, a Nevada limited liablity company with offices at 12460 Crabapple Road, STE 202 #114, Alpharetta, GA 30004 ("Consultant" or "Keystone") and **Fiserv Solutions, LLC** (as converted from Fiserv Solutions, Inc.) ("Company" or "Fiserv"), and is subject to that certain Consulting Services Agreement ("Agreement") effectively dated as of January 13, 2015, by and between Consultant and Company.

**Project Background**
Keystone will provide Company with best-in-class support related to strategy, best practices, and other consultation related to overall analytics strategic initiatives.  All other requests will be out of scope for this SOW.

1. **Summary**
   a. Project Specifics:
      i. Commencement:       February 1, 2020
      ii. Term:                   February 1, 2020 – December 31, 2020
      iii. Conclusion:           On or before December 31, 2019

2. **Project Scope**
   The project scope for this SOW is limited to strategy work and consultation performed.  The above scope applies only to ePayments requirements for analytics.  This schedule may change, as agreed on, or due to changes made in priority by Fiserv and communicated to Keystone.

   **Analytics Included By Release**

   - **Q1 2020 – Q4 2020**
     - ✓ .25 FTE – Principal Consultant

3. **Project Approach**
   The initial project schedule and timeline will be created at kickoff with Keystone and Company and modified from time-to-time as mutually agreed to and will not exceed the terms of this Statement of Work without an executed Change Order.

4. **Project Resources**
   The project team will be available and/or engaged at various times depending on the portion of the deployment or analytics cycle a project is on, but may include:
   - Principal Consultant - Strategy

5. **Quality Management Process**
   Changes in scope, direction, support requirements, or priority will be communicated by Company to Keystone in writing or via a Change Order, pursuant to the procedures set forth in Section 2.2 (Changes in Scope of SOW) of the Agreement. Impact to existing timelines and budget will be evaluated and communicated back to Company in writing with a request for authorization to proceed, if needed, in a written Change Order.

6. **Financial and Project Information**
   a. This Statement of Work is based on a Fixed Fee support augmentation model.  All projects and estimates are based on information available and provided and those estimates may change depending on additional requests, alteration of the scope, new or unforeseen complexities, new priorities or requests communicated in writing by Company; provided, however, that Keystone will not exceed the hours estimated unless (a) there is a change in scope of the assignment that materially impacts the number of hours of work required; and (b) the parties agree on such change in scope, schedule, and pricing in writing via a Change Order.
   b. This effort assumes a 9am to 5pm Eastern Time schedule.  Standard 5-day business week calendar from the periods of 9am to 5pm Eastern Time, Monday through Friday, with a project hour cap of 460 hours for the term.  Schedules may shift to support local offices as needed for projects or based on resource locations.  This schedule assumes standard holidays, PTO, and sick time.
   c. This discounted fixed fee rate is contingent upon payment as outlined in the payment terms below.
   d. For all instances where authorization is required in writing (such as hours consumed, new hours required, impact statements to current project timelines, travel expenses, or other approval scenarios as outlined in this document) email is and will be considered "in writing" both from a notification and response perspective and will specifically call out required approval and actions as necessary.
   e. Travel Expenses – Travel is not included in this SOW and all reasonable and pre-approved travel expenses must be invoiced in accordance with Section 3.6 of the Agreement.

    f.    Media and Public Relations – This discounted fixed fee rate is contingent upon the following participation of Company with Keystone subject to Section 6.1 of the Agreement:

        a.    Ability to use Fiserv logo, in accordance with Fiserv branding guidelines, in standard Keystone collateral which may include sales presentations, internal meetings, external website, and other marketing material. General logo use is limited to indication of Fiserv as a client of Keystone for the purposes of digital measurement strategy and execution. For all other presentations, education, or collateral the use of Fiserv logo will be as agreed in writing by Fiserv, and in accordance with Fiserv branding guidelines.

        b.    Testimonial from Sr. Leadership at project kickoff and end of engagement, and key milestones as mutually agreed on throughout the term of the SOW and with prior approval and consent from Fiserv.

        c.    Reference calls with Keystone prospects with prior notice and scheduling availability, as mutually agreed on in advance.

        d.    Four (4) joint case studies/white papers on key value propositions for both Keystone and Fiserv over the term of engagement.

**Payment Terms are as follows:**

    g.    The fee covering the term of this SOW  shall be paid according to the following schedule:  Upon execution of this SOW,  Fiserv will be invoiced in the amount of  $12,980.00.  Fiserv will then be invoiced $6,480.00 on the first of each month beginning April 1, 2020 and a final invoice sent December 1, 2020.  Payment is due in accordance with Section 3.3 of the Agreement.  Incidentals not provided for in this SOW shall be billed in accordance with Section 3.6 of the Agreement. Per Section 7.5 of the Agreement, in the event Fiserv terminates this SOW for any reason, Keystone shall reimburse Fiserv for all unearned fees which were prepaid by Fiserv.

| Item | Duration | Cost |
| --- | --- | --- |
| 2020 Strategic Support | Feb 1, 20 – Dec 31, 20 | $71,300 |

IN  WITNESS  WHEREOF,  the  parties  have  caused  this  Statement  of  Work  to  be  executed  by  their  duly  authorized representatives.

**Keystone Solutions, LLC**

By: _Matt Gellis_
730A64FA37664B2...

Print Name: Matt Gellis

Title: CEO

Date: March 26, 2020 | 11:00 PDT

**Fiserv Solutions, LLC**

By: _Megan Pannier_
0673A060307645C...

Print Name: Megan Pannier

Title: Authorized Signatory

Date: March 26, 2020 | 16:53 CDT

# EXHIBIT "I"

DocuSign Envelope ID: AECE9B49-67E7-4C03-B117-5CC3ABF2E43C

## STATEMENT OF WORK #13

This Statement of Work (the "Statement of Work" or "SOW") is effectively dated as of February 1, 2021, by and between **Keystone Solutions, LLC**, a Nevada limited liablity company with offices at 12460 Crabapple Road, STE 202 #114, Alpharetta, GA 30004 ("Consultant" or "Keystone") and **Fiserv Solutions, LLC** (as converted from Fiserv Solutions, Inc.) ("Company" or "Fiserv"), and is subject to that certain Consulting Services Agreement ("Agreement") effectively dated as of January 13, 2015, by and between Consultant and Company.

**Project Background**
Keystone will provide Company with best-in-class support related to strategy, best practices, and other consultation related to overall analytics strategic initiatives.  All other requests will be out of scope for this SOW.

1. **Summary**
   a. Project Specifics:
      i.   Commencement:      February 1, 2021
      ii.  Term:                      February 1, 2021 – December 31, 2021
      iii. Conclusion:             On or before December 31, 2021

2. **Project Scope**
   The project scope for this SOW is limited to senior strategy work and consultation performed.  The above scope applies to Payments and Digital Solutions requirements for analytics and the establishment of global governance and shared service models for analytics.  This schedule may change, as agreed on, or due to changes made in priority by Fiserv and communicated to Keystone.

   **Analytics Included By Release**

   - **Q1 2021 – Q4 2021**
     - ✓ .25 FTE – Principal Strategic Consultant

3. **Project Approach**
   The initial project schedule and timeline will be created at kickoff with Keystone and Company and modified from time-to-time as mutually agreed to and will not exceed the terms of this Statement of Work without an executed Change Order.

4. **Project Resources**
   The project team will be available and/or engaged at various times depending on the portion of the deployment or analytics cycle a project is on, but may include:
   - Principal Consultant - Strategy

5. **Quality Management Process**
   Changes in scope, direction, support requirements, or priority will be communicated by Company to Keystone in writing or via a Change Order, pursuant to the procedures set forth in Section 2.2 (Changes in Scope of SOW) of the Agreement.  Impact to existing timelines and budget will be evaluated and communicated back to Company in writing with a request for authorization to proceed, if needed, in a written Change Order.

6. **Financial and Project Information**
   a. This Statement of Work is based on a Fixed Fee support augmentation model.  All projects and estimates are based on information available and provided and those estimates may change depending on additional requests, alteration of the scope, new or unforeseen complexities, new priorities or requests communicated in writing by Company; provided, however, that Keystone will not exceed the hours estimated unless (a) there is a change in scope of the assignment that materially impacts the number of hours of work required; and (b) the parties agree on such change in scope, schedule, and pricing in writing via a Change Order.
   b. This effort assumes a 9am to 5pm Eastern Time schedule.  Standard 5-day business week calendar from the periods of 9am to 5pm Eastern Time, Monday through Friday, with a project hour cap of 460 hours for the term.  Schedules may shift to support local offices as needed for projects or based on resource locations.  This schedule assumes standard holidays, PTO, and sick time.
   c. This discounted fixed fee rate is contingent upon payment as outlined in the payment terms below.
   d. For all instances where authorization is required in writing (such as hours consumed, new hours required, impact statements to current project timelines, travel expenses, or other approval scenarios as outlined in this document) email is and will be considered "in writing" both from a notification and response perspective and will specifically call out required approval and actions as necessary.
   e. Travel Expenses – Travel is not included in this SOW and all reasonable and pre-approved travel expenses must be invoiced in accordance with Section 3.6 of the Agreement.

**Payment Terms are as follows:**

f.   The fee covering the term of this SOW  shall be paid according to the following schedule:  Upon execution of this SOW,  Fiserv will be invoiced in the amount of  $5,454.  Fiserv will then be invoiced $5,454 on the first of each month beginning March 1, 2021 and a final invoice in the amount of $5,460 sent December 1, 2021.  Payment is due in accordance with Section 3.3 of the Agreement.  Incidentals not provided for in this SOW shall be billed in accordance with Section 3.6 of the Agreement.  Per Section 7.5 of the Agreement, in the event Fiserv terminates this SOW for any reason, Keystone shall reimburse Fiserv for all unearned fees which were prepaid by Fiserv.

| Item | Duration | Cost |
|---|---|---|
| 2021 Strategic Support | Feb 1, 21 – Dec 31, 21 | $60,000 |

IN WITNESS WHEREOF, the parties have caused this Statement of Work to be executed by their duly authorized representatives.

**Keystone Solutions, LLC**

By: _Matthew Gellis_

Print Name: 730A64FA37664B2... Matthew Gellis

Title: CEO

Date: 2/9/2021

**Fiserv Solutions, LLC**

By: _R. W. O'H_

Print Name: 61E7018688B247A... Robert O'Hara

Title: Authorized Signatory

Date: 2/9/2021

# EXHIBIT "J"



October 15, 2021

**VIA EMAIL ONLY: mgellis@keystonesolutions.com**                    **Pursuant to FRE 408**
Matthew Gellis
Keystone Solutions

     Re: *Good Faith Breach Summary of Complaint / Breach*

Dear Mr. Gellis:

We are writing to you in response to your September 24, 2021 notice to Fiserv of Keystone Solution's ("Keystone") retention of litigation counsel in an exploratory role related to a breach of contract.  It is not completely clear what the legal basis is for your complaint.  However, I have tried my best to address them in this letter.  If one is somehow not addressed, you should not assume Fiserv agrees with Keystone's position. Fiserv does not agree it has breached any agreement with Keystone in any way.

As you know, Fiserv has paid all invoices provided by Keystone in a timely manner and properly terminated SOW 13 as allowed under the Consulting Service Agreement (CSA) with an effective date of January 13, 2015 (the "Agreement"). Despite these facts, Keystone appears to make the assertion that SOWs 6-12 should not have received the discounted hourly rate as set forth and, as a result, Keystone is entitled to damages.

What is unclear is the legal basis by which Keystone believes it is entitled to these damages. The history between the parties shows that Keystone was quite eager to continue the relationship given the number of SOWs that the parties entered into.  If Keystone felt that Fiserv's performance was not appropriate it certainly had a number of opportunities to rectify the situation.  That of course never occurred, and instead Keystone continued to create new SOWs and bill Fiserv for the work performed.

Keystone appears to allege at least $729,050 in damages. However, these claims do not withstand scrutiny for a number of reasons. As you know, the Agreement provides that any claim must be brought with 2 years.  *See* Section 11.2

       11.2 <u>Limitations Period</u>. Except with respect to Consultant's indemnification obligations or
       claims related to Confidential Information, neither Party may assert any claim against the
       other related to this Agreement more than two years after such claim accrued.

Even if Keystone had a viable claim as to SOWs 6-10, which Fiserv disputes, that claim period has run.  Further Keystone's threat of adding additional damages caused "by lack of having these [sic] during key times during the ongoing projects" is equally unavailing as these types of damages were specifically excluded under Section 11.1(a).

Keystone has also not articulated how these damages relate to any legal claim or cause of action. The parties agreed to a SOW and Fiserv paid.  Then the parties entered into several more over many years.  The course of dealing would indicate both sides were satisfied with how the Agreement was performed by the parties.

All of this makes clear that there is no breach of the Agreement as Keystone claims.  If Keystone would still like to proceed with informal dispute resolution, despite the information provided above, Fiserv is happy to participate.  Please let me know when you are available and

who will be participating from Keystone's side.  We will then provide the names of the persons Fiserv designates.

This letter shall not act as a waiver of any rights by Fiserv, all of which are expressly reserved.


Sincerely,


David E. Frank
Vice President, Associate General Counsel
david.frank@fiserv.com

Fulton County Superior Court
***EFILED***TV
Date: 9/8/2022 1:22 PM
Cathelene Robinson, Clerk

**General Civil and Domestic Relations Case Filing Information Form**

☐ **Superior or** ☐ **State Court of** _____ **County**

| **For Clerk Use Only** | |
| --- | --- |
| **Date Filed** ___9/8/2022_____ | **Case Number** ___2022CV369921_____ |
| **MM-DD-YYYY** | |

**Plaintiff(s)**

| Last | First | Middle I. | Suffix | Prefix |
| --- | --- | --- | --- | --- |

| Last | First | Middle I. | Suffix | Prefix |
| --- | --- | --- | --- | --- |

| Last | First | Middle I. | Suffix | Prefix |
| --- | --- | --- | --- | --- |

| Last | First | Middle I. | Suffix | Prefix |
| --- | --- | --- | --- | --- |

**Defendant(s)**

| Last | First | Middle I. | Suffix | Prefix |
| --- | --- | --- | --- | --- |

| Last | First | Middle I. | Suffix | Prefix |
| --- | --- | --- | --- | --- |

| Last | First | Middle I. | Suffix | Prefix |
| --- | --- | --- | --- | --- |

| Last | First | Middle I. | Suffix | Prefix |
| --- | --- | --- | --- | --- |

**Plaintiff's Attorney** _____ **State Bar Number** _____ **Self-Represented** ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____   _____
**Case Number**                    **Case Number**

☐ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.